2009 OK 21

**Joe MORGAN and Darla Morgan as husband and wife, as Parents and Next Friends of Shelby Jo Morgan, a minor, Plaintiffs/Appellees,**

v.

**OKLAHOMA SECONDARY SCHOOL ACTIVITIES ASSOCIATION, Defendants/Appellants.**

No. 106,747.

Supreme Court of Oklahoma.

March 31, 2009.

Mark S. Grossman, Nkem A. Houseworth, Crowe & Dunlevy, Oklahoma City, OK, Susan Elizabeth Huntsman, Crowe & Dunlevy, Tulsa, OK, for defendant/appellant.

Frank Sullivan, Jr., Sallisaw, OK, for plaintiffs/appellees.

EDMONDSON, C.J.

¶ 1 The Oklahoma Secondary School Activities Association (Association) appeals from an order of the trial court restraining the enforcement of Association's "transfer rule" under which high school student-athlete, Shelby Jo Morgan, was declared ineligible to play on the varsity basketball team at Sallisaw High School to which she had transferred. Shelby and her parents, Joe and Darla Morgan (Morgans) sought and were granted injunctive relief from the trial court after the Board of Directors of the Association denied their application for a hardship exception to the rule. The dispositive issue before us is whether the trial court erroneously granted the temporary injunction. We find that it did and we reverse and vacate the order.

¶2 In light of the upcoming state basketball tournament, this Court granted the Association's motions to retain and expedite this appeal as the participation of an ineligible student may result in forfeiture of games, therefore risking harm to other schools as well as to Sallisaw High School, if the injunction were to be reversed.

¶3 The Association is a voluntary unincorporated association comprised of 483 secondary schools within Oklahoma; all public schools, including Sallisaw High School, are members as are many nonpublic schools, both private and religious. The Association was established for the primary purpose of providing effective coordination, leadership, supervision and regulation for secondary school activities, including athletics, for its member schools. The Association has a constitution, and extensive rules and regulations to which all member schools have agreed to be bound. In order to become a member of the Association, a school must file a resolution adopted by the board of education for its district which authorizes the membership and directs the administrative head of that school to comply with the rules, regulations and requirements of the Association. Article VI, Section 4(g) of the Association's Constitution provides that the Board of Directors "shall have the authority to interpret the provisions of the Constitution and the Rules of the Association, as well as the Policies and Procedures adopted by the Board, investigate alleged violations and shall be the final judge as to whether a violation has occurred."

¶4 For athletics, the Association regulates interscholastic competition between schools and, among other things, it sets eligibility rules, establishes athletic divisions and holds state play-offs and championships. The rules of the Association governing athletic eligibility are intended to avoid disruption of academic progress, discourage an overemphasis on athletics to the detriment of other educational concerns, preserve athletic participation opportunities, prevent recruitment of students, and protect students from exploitation. Hardship Manual, IV, p. 68. In addition to age and academic requirements, athletic eligibility is established and maintained by residence, which is generally determined by the bona fide residence of the student's parents or legal guardian. Rule 8, at issue here, provides that a student who has established athletic eligibility at a secondary school and then transfers to another school is ineligible for one full school year at the new school.

¶5 In recognition of the fact that some students will be compelled to transfer to other schools by reason of hardships beyond the control of the student or parent, the rules of the Association authorize the Board of Directors to grant exceptions to the application of Rule 8 and to reinstate a student's eligibility upon a finding that circumstances exist where application of the rule would "work an undue hardship on the student, or that the application of the rule would otherwise fail to accomplish the purposes for which it is intended." Rule 8, Sec. 3(a). The rules provide for the Board's establishment of written criteria and procedures for the evaluation and determination of applications submitted for approval of this hardship exception. The particular written criteria established by the Board for granting a hardship exception or waiver to a student-athlete are set out in the Association's Hardship Waiver Manual, Sec. VI(D)(2), pp. 69–70, as follows:

(1) A legitimate need to care for seriously ill or infirm relatives.

(2) An unstable home environment in which the physical and/or emotional health of the student is at serious risk.

(3) A substantial negative change in the financial condition of the parents, or custodial parent or court-appointed guardian with legal custody of the student.

(4) Remaining in a school district where the student is established.

(5) Placement in a different residence by order of court or a supervising government agency.

(6) A professional staff member's recommendation that the student who is undergoing chemical abuse rehabilitation transfer to another school because a program necessary to the student's health or rehabilitation is not available at the student's current school.

(7) A sincere desire to continue a course of study, program, or activity in which the student was already actively involved which is not available at any school in the district or area in which the parents, or ... guardian ... have established a bona fide residence, or which is no longer available at the student's previous school.

(8) An annexation, redistricting, or school closing affecting that student.

¶ 6 Following each stated criterion, the Manual sets forth a detailed description of the type of documentation and information describing and verifying the student's situation which must be submitted by the student in support of the request based thereon. The Manual additionally provides for the possibility of a hardship waiver to be granted by reason of:

(9) Any other circumstance beyond the control of the student which creates an unavoidable hardship for that student.

¶ 7 Again, the burden is expressly placed on the student and his or her family to demonstrate the existence of a hardship within the intention of the rules, as follows:

"Documentation verifying the relevant facts and explaining the impact upon the student in question must be submitted. Consideration will be given only if special circumstances beyond the control of the student create an unavoidable hardship. Exceptions will be a rarity." *Id.* at 70.

¶ 8 Additionally, the Hardship Manual expressly provides that a hardship waiver request "will not be considered or approved" where the circumstances are that there is "discontentment with [the] school in which the student's eligibility has been established." *Id.*, Sec. VI(D)(2), at p. 71.

¶ 9 The material facts are not in dispute. In 2008, Shelby Morgan was a junior at Central High School where she played varsity softball and varsity basketball. On February 1, an altercation between her father and a member of the School Board of the Central Public Schools occurred following a game played at another school. Officials from Central High School, including the Superintendent, Max Tanner, as well as officials from the host school district and security

officers from that community, ultimately intervened and Mr. and Mrs. Morgan were asked to leave the school. The dispute arose from comments about the basketball coach that Mr. Morgan made to another parent. Shelby was not present during this altercation and she did not cause the problem which arose between the adults that evening.

¶ 10 As a result of that event, Mr. Tanner asked the Morgans to come to the school for a meeting so they could all discuss the situation and establish standards of conduct that would be required for their attendance at future games, but the Morgans refused to attend the meeting. Mr. Tanner then sent them a letter ordering them to stay off school property and away from school activities, including athletic events. They were advised that they could appeal the superintendent's decision to the school board, but they did not appeal. They followed the directive of the letter and did not attend the next basketball game which was held on February 5.

¶ 11 At that game, Shelby suited up, but during pregame warm-ups she decided that playing without the support and encouragement of her parents in attendance was too upsetting, and she quit the team before the game started. Although she did not participate in any varsity sports, Shelby continued to attend Central High School for another two months, until she withdrew and transferred to Sallisaw High School on April 4, 2008. At that time, a Hardship Waiver Application was submitted on Shelby's behalf to the Association for reinstatement of her athletic eligibility, which relied on the general provision of section VI(A)(9) in the Hardship Manual of a "circumstance beyond the control of the student which creates an unavoidable hardship for that student."

¶ 12 While those material facts set forth above are not controverted, the underlying factual circumstances surrounding the February 1 altercation and its aftermath—who was at fault, who said what to whom and when, who did what during and after the arguments, who did or did not try to resolve this matter before it got out of hand, etc.,— are disputed and that dispute has been the focus and substance of the Morgans' efforts

before the Association and of this subsequent judicial action.

¶ 13 In a letter submitted in support of Shelby's Hardship Application, Mr. Morgan contended that the situation involving the administration of Central High School and himself and his wife came within the rule because it was a circumstance "beyond the student's control." In regard to that situation, he complained that the administration had overreacted and acted beyond its authority in issuing its letter banning them from school property and athletic events, and he stated that the letter had caused Shelby emotional turmoil and stressful hardships which had affected her academically and athletically, resulting in her nonparticipation in athletics at Central High School.

¶ 14 The Association denied the hardship waiver by letter dated May 14, 2008, for failure to submit information which met the criteria for eligibility, and Shelby was advised that she could participate only in non-varsity athletics until the one-year ineligibility period was over. In September, 2008, the Morgans appealed to the Board of Directors and hearing was held before the Board on September 10, 2008, in which Shelby and her parents testified and offered evidence in support of their position that the altercation was not started by the fault of Mr. Morgan and that the superintendent acted unfairly in his resolution of the situation. Additionally, Mr. Morgan and Shelby testified that they had been unhappy previously with the Central High School basketball coach who was the also the softball coach. The Board denied their appeal.

¶ 15 The Morgans then sought an order from the District Court of Sequoyah County restraining the Association from enforcing of its ruling that Shelby was ineligible to participate in varsity athletics at Sallisaw High School. That court issued a temporary restraining order and, after subsequent hearing, issued the temporary injunction against the Association which is on appeal here.

¶ 16 The Association maintains that a student's participation in interscholastic athletics is not a right but a mere privilege which is subject to the eligibility rules promulgated by the Association, and that the determination of the proper application and enforcement of those rules and their exceptions should be made by the Association, not the courts.

¶ 17 We agree. It is fundamental that voluntary unincorporated associations such as the Oklahoma Secondary School Association, through their members, are free to adopt rules that govern their interaction and that they are free to enforce those rules without undue interference by the courts. It is provided at 6 Am.Jur. 2nd, Associations and Clubs, sec. 27, that:

"As a general rule, courts refrain from interfering in the internal affairs of voluntary associations, and unless the property or pecuniary rights of member are involved, the decisions of the tribunals of an association with respect to its internal affairs will, in the absence of mistake, fraud, illegality, collusion, or arbitrariness, be accepted by the courts as conclusive."

¶ 18 We have long upheld the requirement of judicial deference to the actions of the Association in the exercise of its authority to establish and enforce its rules controlling students' athletic eligibility. See *Morrison v. Roberts,* 1938 OK 458, 82 P.2d 1023 (extraordinary relief granted by trial court would not lie against athletic association's enforcement of its order declaring student ineligible for one year for violation of its rule prohibiting acceptance of award); *Oklahoma Secondary School Activities Association v. Midget,* 1972 OK 154, 505 P.2d 175 (injunctive relief not warranted to prevent Association's enforcement of violation of eligibility rules by declaration of forfeiture of football game); *Mahan v, Agee,* 1982 OK 116, 652 P.2d 765 (injunctive relief not warranted for Association's denial of student's application for waiver of age eligibility rule based on alleged hardship); *Mozingo v. Oklahoma Secondary School Activities Association,* 1978 OK CIV APP 8, 575 P.2d 1379 (injunctive relief not warranted for Association's denial of requests by two football players for hardship exceptions to application of Rule 8); *Brown v. Oklahoma Secondary School Activities Association,* 2005 OK 88, 125 P.3d 1219 (injunctive relief not warranted to prohibit Association from enforcing its order suspend-

ing athlete from participation in two football games for unsportsmanlike conduct).

¶ 19 In *Brown,* we stated:

"Regarding judicial interference with a voluntary association, we have long abided by the general rule that the courts should not intervene except to ascertain whether association proceedings are conducted pursuant to the rules and laws of the organization, in good faith and lawfully. Absent fraudulent, collusive, unreasonable, arbitrary or capricious behavior, this Court may not overturn a voluntary association's enforcement of its rules. We may not interject ourselves into the Association's internal affairs if the rules are reasonable, lawful, in keeping with public policy and are interpreted fairly and reasonably and enforced uniformly and not arbitrarily." *Id.* at 1224.

¶ 20 In *Morrison v. Roberts,* 1938 OK 458, 82 P.2d 1023, the Court spoke to the issue of the proper role of the judiciary in consideration of the rules of a voluntary athletic association as well as to the rights of the individual student versus the power of the association to control eligibility, and stated the following:

The courts generally should leave the final authority in the athletic official or board, with whom that authority is placed by those who had authority to make the rules and authorize the method of application and enforcement.

The plaintiff has many rights as a citizen and as a high school student, but he has no vested right in "eligibility" as dealt with at such great length in the rules of the Oklahoma High School Athletic Association. The defendant board of control was clothed with ample authority to so construe, apply, and enforce this rule, with its specific provision for "ineligibility" for one year.

These rules are subject to change if the member schools desire a change. This may be done at the annual meeting or by referendum vote according to specific provision. But so long as these member schools ... desire to attach all of these many conditions, limitations, and restrictions on their "eligibles," then surely they

should be permitted to do it, so far as the courts are concerned. There is nothing unlawful or evil in any of those rules nor in the provision resting final authority in the board of control. Surely the schools themselves should know better than anyone else the rules under which they want to compete with each other in athletic events. And doubtless every one of these rules is founded upon reasons wholly satisfactory to the member schools. And if the officials of the various high schools desire to maintain membership in the association, and to vest final rule enforcement authority in the board of control, then, so far as affects the affairs of the association, the courts should not interfere. *Id.* at 1025.

■ ¶ 21 The standard of review for the issuance of a temporary injunction is whether the trial court abused its discretion or entered a decision against the evidence. *Brown,* 125 P.3d at 1225. There is no evidence of fraud or collusion or of action by the Association that was unreasonable, arbitrary or capricious. The Morgans were not entitled to injunctive relief and the trial court abused its discretion by intruding into the affairs of the Association. The trial court erred in granting the injunction. Under the above authorities, the Association must be allowed to enforce its rules and orders without undue interference by the courts. The injunction is vacated and the matter is reversed with instructions to enter judgment for the Association.

¶ 22 EDMONDSON, C.J., TAYLOR, V.C.J., OPALA, WATT, WINCHESTER, COLBERT, JJ., Concur.

¶ 23 HARGRAVE, KAUGER, REIF, JJ., Dissent.

OPALA, J., with whom TAYLOR, V.C.J. and WINCHESTER, J., join, concurring

¶ 1 At issue here is the correctness of the trial court's action by temporarily enjoining the defendant (a school association) from enforcing against a high school student athlete its rule under whose terms the athlete became ineligible to play on the Sallisaw High School's basketball team.

¶ 2 The legal propriety of a district court decision that either sustains or sets aside a ruling by a voluntary school association is reviewed in an appellate court by applying the standard most recently announced in *Brown v. Oklahoma Secondary School Activities Assn.*, 2005 OK 88, 125 P.3d, 1219. Absent fraudulent collusive, unreasonable, arbitrary or capricious decisional process, a court may not overturn a voluntary association's enforcement of its rules. Concluding from its review of the record that the association's ruling in contest does not offend the prohibited norms of decisional behavior, the court reverses the trial court's temporary injunction as an impermissible interference with the association's freedom of action. While I concur in today's disposition and in the court's pronouncement, I write separately to **add** with emphasis that in their quest for relief the student athlete's parents **neither rely** on the association's use of any prohibited norms in its decisional process **nor contest** the association's legal status as a private (nongovernmental) entity in an effort to secure this court's re-examination of the trial judge's ruling under a more favorable standard of review than that which governs rulings by voluntary **private** school associations.

KAUGER, J., with whom HARGRAVE, REIF, JJ., join, dissenting:

¶ 1 The issue presented is whether the trial court abused its discretion in granting a temporary injunction precluding the Oklahoma Secondary School Activities Association (the OSSAA) from denying an athlete the opportunity to play varsity basketball and softball her senior year. Because, under the facts presented,[1] I can find no abuse of discretion, I would affirm the trial court.

## FACTS

¶ 2 The majority neglects to start from the very beginning with the catalyst which precipitated this lawsuit. While some of the precise details of the events are presented in a "he said, he said, she said" fashion, the majority of the facts are undisputed—*at least* to the extent that a clear picture of what happened is presented.

¶ 3 On Friday, February 1, 2008, Shelby Jo Morgan (Shelby), a high school junior at Central High School in Sequoyah County, was playing basketball at the Boynton High School gymnasium. Her parents, the appellees, Joe and Darla Morgan (father/mother, collectively parents), attended that game just as they had attended every other game of her career.[2] After the girls' game ended, Shelby's father went to the restroom. While standing at the urinal, the father discussed the game with another man in the restroom, Robert Sutherland.

¶ 4 The father expressed disappointment both in the outcome of the game and with the performance of the coach. In his own words, he said, "(O)ur coach sucks."[3] Another man in the restroom, Jay Fleetwood, a twenty-five year member of the Central High School

1. Ordinarily, because the OSSAA is a voluntary association, we do not interfere with its internal decision making. However, our previous decisions did not involve such a blatant violation of internal due process procedures or such egregious facts. Consequently, they are not dispositive here. For example, in *Brown v. Oklahoma Secondary School Activities Association*, 2005 OK 88, ¶ 10, 125 P.3d 1219, the student was directly involved in the dispute and the dispute involved a matter which occurred on the football field and was witnessed by a referee. In *Mahan v. Agee*, 1982 OK 116, ¶ 2, 652 P.2d 765, the student had turned 19 and had exceeded the age limit eligibility requirement. In *Oklahoma Secondary School Activities Association v. Midget*, 1972 OK 154, ¶ 9, 505 P.2d 175, the OSSAA did not have a meeting as required by its Constitution, but the Court determined it unnecessary because the

principal of the high school which used the ineligible player gave initial information directly to the secretary and neither the ineligible player nor his high school sought any relief.

2. Trial Transcript of October 20, 2008, testimony of Shelby Morgan provides in pertinent part at p. 9:

...Q. Do your parents attend your games?
A. Every one.
Q. Can you ever remember them not attending?
A. No....

3. Trial Transcript of October 20, 2008, testimony of Joe Morgan provides in pertinent part at p. 27:

... I said basically what me and him was talking about, our coach sucks....

Board (school board member),[4] interjected himself into the conversation, asking the father to repeat what he had said. According to the father, the school board member waited outside the restroom and grabbed the father by the arm as he exited. The board member then informed the father that if he had a problem with the coach, he could express it to the other four school board members who were present. He also implied that the father could move his two girls from Central school.[5] The father suggested they take the conversation outside.

¶ 5 This is the event which precipitated this entire dispute. Nowhere in the record are these facts disputed. They are argued to be unknown by some, or irrelevant by others, but not disputed. It is, however, at this point that the *Rashomon* effect kicked in [6] and everyone involved in the situation had their own account of what happened next. Taken collectively, there seems to be agreement that at some point: 1) the situation became somewhat heated and intense; 2) the superintendent of Central High School, Mr. Tanner (superintendent) interjected himself into the matter; 3) the mother, after being informed of the disturbance, left the bleachers to check on and join her husband; 4) a deputy/security person at the ball game intervened; 5) a few other ball game attendees witnessed the events from the bleachers and also intervened; 6) Coach Rodden, the athletic director of Central High intervened in an attempt to calm everyone down; and 7) some of the administration from the opposing team were present as well. A few days after the events occurred, the superintendent suggested that the father's breath had smelled of alcohol, but no one else made the same suggestion, nor did the superintendent report it on the night in question.

¶ 6 Apparently, the situation did not rise to the level of a physical altercation because no punches were thrown. Nevertheless, it is undisputed that fingers were pointed and arms were grabbed.[7] The parents also admittedly used profanity and were ultimately asked to leave the ball game. Everything had calmed down and the parents waited by the door for Shelby to finish dressing in the locker room when the superintendent once again tried to interject himself in the matter. The security officer ordered the superintendent to return to his seat or risk being thrown out.[8] Shelby was not present or involved in the scuffle.

4. Trial Transcript of October 20, 2008, testimony of Superintendent Max Tanner provides in pertinent part at p. 139:
   ...A. I had talked to the patron, yes, Mr. Fleetwood.
   Q. You keep calling him a patron. He's more than a patron isn't he? He's your board member?
   A. He's a board member.
   Q. How long has be been a board member?
   A. Twenty-five years....

5. Trial Transcript of October 20, 2008, testimony of Joe Morgan provides in pertinent part at p. 28:
   ...He grabbed my arm and pulled me up to him. He said you do know we have four more board. I said yes, I understand that, Jay, but I was not talking to you. I said I have nothing to say to the board members. He said you know you have other options. I said them options meaning I move my two girls from Central school, is that what you're saying. He said that's one of them. That's when I said I think we need to go outside and have this conversation....

6. *Rashomon* is a 1950 Japanese film directed by Akira Kurosawa. The story of a man's murder and the rape of his wife is told four different times, each from the point of view of one of the participants. While each participant's version is different, it becomes apparent that each person has come to believe that their version is the truth.

7. Trial Transcript of October 20, 2008, testimony of Superintendent Max Tanner, provides in pertinent part at p. 126:
   ...I can see that they're starting to argue a little bit. I started heading that way.
   About that time, they enter the lobby area. They're like headed outside. At that point, I get there. The high school principal is in between both of them saying just calm down. At that point I asked Joe—I said what's going on. That's when he hollers out let's ... go, let's just ... go outside.
   At that point I can see that talking to Joe at that point is not going to help. I turn and I ask the patron—I said what's going on. That's when I get four knuckles stuck into my chest saying I ... want to talk to you right now. That was Joe Morgan....

8. Trial Transcript of October 20, 2008, testimony of Darla Morgan provides in pertinent part at p. 63:
   ...Q. You've gone upstairs and Mr. Tanner is once again going back to Joe?

¶ 7 On Monday, February 4, 2008, the superintendent phoned the father and directed him to come to his office to discuss the Friday night events. The superintendent also informed the father that he had "terms" regarding both parents ability to attend any future games. Once again, differing versions of exactly what was said during the conversation are presented. According to the father, he refused to meet with the superintendent unless five school board members and his attorney or a witness were present—and the superintendent told him "that ain't going to happen." [9] The superintendent insists that he begged the father to come in and that the father told him that he could either meet with him or the school board and that the father said he wasn't "going to talk with those s* *s of b* * * * *s." [10] Needless to say, the father never met with the superintendent, explaining that a one on one meeting was pointless because the superintendent was directly involved in and participated in the events which had occurred at the Friday night ball game.

¶ 8 The next day, the father received a letter from the superintendent dated February 4, 2008, which informed him that because he and his wife interfered with the peaceful conduct of activities at the school district, they were banned from all school premises including all activities and all sanctioned events. The next day Shelby suited up for another ball game, but after deciding she could not stand to watch the superintendent walk up and down the sidelines if her parents could not be there to support her, she turned in her uniform and quit the team.[11] Two months later, on April 4, 2008, Shelby transferred to Sallisaw High School (the school). According to Shelby, she transferred because she was struggling with the lack of desire to attend school and do school work or homework. Additionally, she could not handle seeing the superintendent standing in the hallways every day. Her testimony reflects that she felt hurt, upset, and offended.[12]

A. Yes. After I said what I said to Max, the deputy says, sir, you need to go back into the gym and sit down. Max says I'm the superintendent of Central schools. He said I don't care who you are. Either you go find a place to sit down or you're going to be leaving as well. That was that.

Q. Then with what kind of attitude did Mr. Tanner depart?

A. He was not happy....

9. Trial Transcript of October 20, 2008, testimony of Joe Morgan provides in pertinent part at p. 34:

...A. He called me on Monday, but he wanted the meeting Tuesday morning before the game so he could lay down some laws.

Q. Is that what he said?

A. Yes. I said can't do it, Max. He said why not. I said you're one of them I got into with. And then I told him the only way I'll come to your meeting is if you have your five board members there and I have my attorney or my witness there for me. He said that ain't going to happen. I said I guess you've got to do what you've go to do because I am not coming to a one on one meeting with you.

Q. What did you think could possibly come of a one on one meeting—I understand it's different if the superintendent wasn't involved. With him being involved, what did you think could possibly come of that meeting.

A. Nothing good on my side....

10. Trial Transcript of October 20, 2008, testimony of Superintendent Max Tanner, provides in pertinent part at p. 131:

...A .... I said well, I was nice enough not to tell them that you had been drinking. I probably shouldn't have even said that. At that point I wanted Joe to come in and speak with me. He said well—he goes I'm not going to come in and talk to you. I said Joe, I'm going to send you a letter that says you cannot come to any school activities.

I said I need you to come in and talk to me or you need to take your grievance to the board of education. I said we can do it either way. He goes well, I'm not going to come in and talk to you. I said would you come and talk to the board. He goes I'm not going to talk to those sons of bitches....

11. Trial Transcript of October 20, 2008, testimony of Shelby Morgan provides in pertinent part at p. 9:

...Q. Did you suit up and go to the game that night?

A. Yes, I did.

Q. What happened before the game started?

A. I suited out and intended on playing and warmed up and just watching Mr. Tanner walk up and down the sidelines and knowing my parents couldn't be there, I didn't want to do it.

Q. So what did you do?

A. Just walked back to the locker room, took off my uniform and walked out.

12. Trial Transcript of October 20, 2008, testimony of Shelby Morgan provides in pertinent part at p. 6:

...Q. How did this affect you?

¶ 9 The Oklahoma Secondary Schools Activities Association (the Association/OSSAA), an association in which both Central Schools and Sallisaw Schools are members, provides rules which govern student transfers from one school to another. Under the rules, when an athletically eligible student transfers to another school, the student is prohibited from playing varsity sports for one year after the transfer—unless a hardship waiver is obtained.[13] Several criteria for "hardships" exist, but the one at issue here provides:

(9) Any other circumstances beyond the control of the student which create an unavoidable hardship for that student.[14]

The rule also requires that:

Documentation verifying the relevant facts and explaining the impact upon the student in question must be submitted. Consideration will be given only if special circumstances beyond the control of the student create an unavoidable hardship. Exceptions will be a rarity.[15]

¶ 10 The Hardship Manual provides that a hardship waiver request "will not be considered or approved" where the circumstances are that there is "discontentment with the schools in which the student's eligibility has been established."[16]

A. At first I really didn't know what was really going on because I didn't understand fully. Then I finally got out there. After I heard everything, I was very upset about it mentally, emotionally....

At p. 9:

...Q. How did that make you feel when you knew that your parents were precluded form coming to watch you perhaps ever again?

A. I was very hurt.

Q. Did you feel like playing.

A. No....

13. Rule 8 of the Rules Governing Interscholastic Activities in Senior High Schools provides in § 2(1) in pertinent part:

...A student who has established athletic eligibility at a school and then transfers to another school is not eligible for a period of one year from the date of first attendance at the new school, unless the student applies for and is granted an exception due to hardship or other qualifying circumstance pursuant to Section 3 below....

Section 3 of the Rule provides in pertinent part:

a. Authority to grant exceptions.

OSSAA may grant an exception to a student facing ineligibility when it is found that the application of this Rule works an undue hardship on the student, or that the application of the Rule would otherwise fail to accomplish the purpose for which it is intended.

b. Criteria and procedures for evaluating exceptions.

The Board of Directors shall establish written criteria and procedures for evaluating applications for exceptions, and those written criteria and procedures shall be made available to member schools....

c. Application for exception.

(1) OSSAA shall make forms for applying for an exception to this Rule available to all member schools.

(2) The member school submitting the forms required for the application is responsible for making certain that the forms are complete and that the application is being submitted in a good faith belief that an exception may be appropriate....

d. Consideration by the Executive Secretary.

All applications submitted pursuant to this Rule shall be reviewed and evaluated by the Executive Secretary and staff. The Executive Secretary or staff designee is authorized to conduct any further investigation or to request any supplementation of the application or supporting materials deemed necessary to the evaluation of the application. The application shall be evaluated using the criteria established by the Board of Directors...

All references to OSSAA's Rules, Constitution and Hardship Waiver Manual are from the 2008–09 versions which were included in the record.

14. The OSSAA's Hardship Waiver Manual, § VI(d)(2), pp. 69–70 provides 9 reasons for hardship which include: 1) need to care for seriously ill or infirm relatives; 2) an unstable home environment in which the health of the child is at risk; 3) a substantial negative change in the financial condition of the parents; 4) remaining in the school district where the student is established; 5) placement in another residence by court order; 6) a student undergoing a chemical abuse rehabilitation program; 7) to participate in an activity which is not available at any other school; 8) annexation or redistricting; and 9) circumstances beyond the student's control.

15. Hardship Waiver Manual, § VI(d)(2)(9), p. 70.

16. Hardship Waiver Manual, § VI(d)(2)(B), pp. 70–71 provides in pertinent part:

The Request submitted must describe which of the above criteria apply to the student, explain why those criteria are applicable, and identify material or information submitted in support for applying those criteria. If one or more of the above-referenced criteria are applicable, then the Request should list all of the applicable criteria and all supporting documentation required to support those criteria should be submitted.

¶ 11 The hardship waiver process clearly adopts the due process provisions of the OS-SAA's Constitution because the "Request for OSSAA Hardship Eligibility Clarification" form provides in bold lettering that "SHOULD THIS HARDSHIP BE DE-NIED, DUE PROCESS RIGHTS AND PROCEDURES CAN BE FOUND BY RE-FERRING TO THE OSSAA ADMINIS-TRATORS' HANDBOOK UNDER CON-STITUTION SECTION 6." [17] The OSSAA Constitution Section 6 is a due process provision which requires an impartial investigation, written notifications, invitations to submit additional pertinent information to the investigation, as well as an opportunity for the schools, the students, and the student's parents to meet with the investigator.[18]

A hardship request should NOT be submitted if the *Transfer Athletic Eligibility Information Form* received from the student's former school, or any other reliable information, indicates that: ...
3. the student transferred due to discontentment with coaches or other personnel at the school at which eligibility was already established; ... (Emphasis in original.)

17. The Request for OSSAA Hardship Eligibility Clarification form which is required to be filled out by the receiving school is attached as *appendix A*.

18. The Oklahoma Secondary School Activities Association Constitution Section 6. DUE PROCESS—Procedures Regarding Investigations, Hearings, and Appeals provides in pertinent part:

a. The Executive Secretary or his/her designee (the "investigator") will conduct an impartial investigation into any alleged violation as soon as is reasonably possible after the allegation is brought to the attention of the Association. Before reaching any determinations, and as soon as is practical in the interest of insuring the investigation is complete, the representative of the member school(s) involved will be notified in writing, when feasible, of the alleged violation and invited to submit any information deemed pertinent to the investigation.
b. If the investigation may impact the eligibility of a student to participate in interscholastic activities or contests, or may result in the imposition of penalties or sanctions on individual school personnel, before reaching any determinations, the investigator shall direct the member school's representative to notify the parents(s) or legal guardian of the student of the alleged violation or the school personnel involved, and to invite them to submit any information they deem pertinent

¶ 12 The school, the parents, and Shelby requested a hardship waiver from the OS-SAA when Shelby transferred to Sallisaw. On the waiver form, they checked "yes" to the question: "Were you suspended, expelled, or under discipline at the previous school attend, or were you or your parents having a conflict with a coach, teacher, or administrator at the time you left your previous school?" They also included documentation explaining that a "situation" had taken place at the ball game on February 1, 2008, between the parents and the Central School administration in which the student was not present or involved, and which was beyond the student's control. They also explained

to the investigation. The member school's representative shall provide the investigator with a written confirmation that his notice has been given within three days of the representative's receipt of notice of the alleged violation. If the investigator determines that the investigation my be compromised or impeded by immediate notice to the student or the student's parent(s) or legal guardian, or the school personnel involved, then notice may be delayed until the risk or interference with the investigation is minimized or eliminated.
c. Prior to reaching any determinations, the investigator shall further afford the school(s), as well as any students(s) involved and the student's parents or legal guardian of such student, the opportunity to request a meeting with the investigator. Any timely request will be granted.
d. Because some action my be necessary before an investigation of an alleged violation can be completed, the Executive Secretary is authorized to take temporary action pending further investigation and determination, if deemed necessary to prevent possible continuing or repeated violations of the Associations's Constitution, Rules, or Policies or Procedures.
e. The Executive Secretary shall notify the representative of the member school(s) involved in writing of his/her decision with respect to the alleged violation as soon as possible after a determination has been made, and shall direct the representative to provide notice of the decision to any student(s) involved. The member school's representative shall provide the Executive Secretary with confirmation that this notice has been given within three days of receipt of notice of the Executive Secretary's decision.
f. A member school or individual aggrieved by a decision of the Executive Secretary

that the "situation" resulted in the parents being banned from the school.

¶ 13 On May 14, 2008, the application for hardship was denied with no reason for the denial given to either the school, the parents, or to Shelby. The parents were notified that Shelby was ineligible to play varsity sports at Sallisaw, but that she could play junior varsity sports at Sallisaw. Because colleges had expressed interest in Shelby's athletic abilities, the parents appealed to the OSSAA's Board of Directors.[19]

¶ 14 A hearing was held at the Board's monthly meeting on September 10, 2008. After the hearing ended, the Board denied the parents' appeal without explanation. The parents' attorney was not able to attend the hearing due to a scheduling conflict, but the attorney did call Danny Rennels, the Executive Secretary of the OSSAA (Executive Secretary), before the hearing. He also sent follow up letters and a statement from Sutherland, the other man present in the restroom, who corroborated the father's story that he did not initiate or cause the February 1, 2008, confrontation. There is no transcript of that hearing included in the record.

¶ 15 On October 1, 2008, the parents filed a petition in the District Court of Sequyah County seeking a temporary restraining order and/or temporary injunction to preclude the OSSAA from enforcing its decision regarding Shelby. The district judge issued a temporary restraining order on October 2, 2008, to restrain the OSSAA from enforcing its decision. A hearing on the temporary injunction was held on October 20, 2008. After the hearing, the trial judge ordered that Shelby be allowed to play ball. The order

was filed on January 22, 2009, and the OSSAA appealed the matter to this Court on January 22, 2009.

¶ 16 **THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN OVERTURNING THE OSSAA'S DECISION UNDER THE FACTS PRESENTED BECAUSE: 1) THE OSSAA'S INTERPRETATION OF ITS HARDSHIP EXCEPTION IS UNREASONABLE; 2) THE OSSAA'S DECISION WAS ARBITRARY AND CAPRICIOUS; AND 3) THE OSSAA ACTED IN VIOLATION OF ITS OWN DUE PROCESS RULES AND PROCEDURES.**

¶ 17 The OSSAA argues that the decision to deny Shelby's hardship request was not unreasonable, arbitrary, or capricious and thus, the trial court was without authority to interfere with the enforcement of its own rules. The parents counter that: 1) the OSSAA failed to reasonably interpret its own rules; 2) the proceedings were fraught with injustice; and 3) the decision was unreasonable, arbitrary and capricious.

### A. The "voluntary" Oklahoma School Secondary Athletics Association.

¶ 18 The OSSAA refers to itself as a "voluntary association responsible for regulating interscholastic competition between public and certain private secondary schools in Oklahoma." The majority characterizes the OSSAA as "voluntary" as well. This Court has previously referred to the OSSAA as "voluntary." In *Brown v. Oklahoma Secondary School Activities Association,* 2005 OK

---

shall each have the right to appeal to the Board of Directors of the Association. . . .

**19.** The Trial Transcript of October 20, 2008, testimony of Darla Morgan provides in pertinent part at p. 58:

. . . Q. Has she had some inquires about college to further her education and her athletic career simultaneously?
A. Yes.
Q. She's had some coaches come visit even recently?
A. She's actually had coaches invite her to practice with them. We've got to schedule that. . . .
And at p. 68:

. . . Q. Did you know that irreparable is one of the words we use in the test for injunctions?
A. No. The thing people maybe haven't taken into consideration not for Joe and I but just for Shelby, I don't know if Shelby would have gotten offered to go play basketball somewhere. She's been offered to play fast pitch somewhere thanks to the coach that's helping her get some exposure.
But if she's not allowed to play her senior year either, I don't know what doors just could be opened, I would like for her to be able to walk through that door. I'm not going to know that and neither is she if she can't play. . . .

88, ¶ 10, 125 P.3d 1219, we described the OSSAA and its purpose, saying:

> The Association is made up of schools who voluntarily apply for membership. One of its purposes is to promote high standards of good sportsmanship. With member input, the Association adopts rules governing the interaction between the Association and the membership. Member schools are presumed to acquiesce in the rules and in the constitutional provision vesting final authority as to whether a rule violation occurs in the Board of Directors.

¶ 19 While the term "voluntary" is used in our prior decisions—for students—the term is a misnomer. A school is required be a member of the OSSAA to participate in state-wide interscholastic athletic events. Students who want to be involved in athletics and who might even choose athletics as a career are required to be bound by the OSSAA rules and procedures if their school is a member and if they want to play sports. In this sense, it is not truly "voluntary" as the term suggests.

¶ 20 Nevertheless, the general rule is that the courts should not intervene in the affairs of such associations, except to ascertain whether association proceedings are conducted pursuant to the rules and laws of the organization, in good faith and lawfully. Absent fraudulent, collusive, unreasonable, arbitrary or capricious behavior, this Court may not overturn a voluntary association's enforcement of its rules.[20] We may not interject ourselves in the OSSAA's internal affairs if the rules are reasonable, lawful, in keeping with public policy, and are interpreted fairly and reasonably and enforced uniformly and not arbitrarily.[21]

¶ 21 The standard of review imposed for the issuance of a temporary injunction is similar—whether the trial court abused its discretion or entered a decision against the evidence.[22] Pursuant to 12 O.S.2001 § 952(b)(2),[23] we may reverse, vacate, or modify a judgment of the district court where, on review, it appears from the nature of the case and all the facts properly before the Court the plaintiff was not entitled to injunctive relief.[24] Injunction proceedings are equitable in nature. Therefore, we consider all the evidence on appeal.[25] Accordingly, we must determine whether the OSSAA's internal affairs were reasonable, lawful, in keeping with public policy, and whether the OSSAA's rules were interpreted fairly, reasonably and not enforced arbitrarily. If this is not the case, the trial court did not abuse its

---

**20.** *Brown v. Oklahoma Secondary School Activities Association,* 2005 OK 88, ¶ 10, 125 P.3d 1219; *Mahan v. Agee,* 1982 OK 116, ¶ 2, 652 P.2d 765; *Oklahoma Secondary School Activities Association v. Midget,* 1972 OK 154, ¶ 9, 505 P.2d 175.

**21.** *Brown v. Oklahoma Secondary School Activities Association,* see note 20, supra; *Mahan v. Agee,* see note 20, supra; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* 1977 OK 17, ¶ 12, 561 P.2d 499, 85 A.L.R.3d 953; *Oklahoma Secondary School Activities Association v. Midget,* 1972 OK 154, ¶ 9, 505 P.2d 175.

**22.** *Brown v. Oklahoma Secondary School Activities Association,* see note 20 at ¶ 11, supra; *Sharp v. 251st St. Landfill, Inc.,* 1996 OK 109, ¶ 4, 925 P.2d 546; *State ex rel. Schulte v. Hallco Environmental, Inc.,* 1994 OK 138, ¶ 2, 886 P.2d 994; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* see note 21, supra.

**23.** Title 12 O.S.2001 § 952(b)(2) provides in pertinent part:

(b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof:
. . . 2. An order that discharges, vacates or modifies or refuses to vacate or modify a provisional remedy which affects the substantial rights of a party; or grants, refuses, vacates, modifies or refuses to vacate or modify an injunction; grants or refuses a new trial; or vacates or refuses to vacate a final judgment;
. . .

**24.** *Brown v. Oklahoma Secondary School Activities Association,* see note 20 at ¶ 11, supra; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* see note 21, supra; *Quaker Oil & Gas Co. v. Jane Oil & Gas Co.,* 1917 OK 192, ¶ 0, 164 P. 671.

**25.** *Brown v. Oklahoma Secondary School Activities Association,* see note 20 at ¶ 11, supra; *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* see note 21, supra; *Vickers v. Vining,* 1969 OK 66, ¶ 0, 452 P.2d 798.

discretion in issuing the temporary injunction.

### B. The OSSAA violated its own Due Process Rules and Procedure and effectively admitted that the decision regarding Shelby was arbitrary and capricious.

¶ 22 We need not address the nature of Shelby's minimal due process rights as a student in these proceedings. Although the OSSAA guarantees due process in hardship proceedings, it failed to follow its constitutional provision. The Request for OSSAA Hardship Eligibility Clarification requires the application of the OSSAA's constitutional due process provisions which provide for: 1) an impartial investigation; 2) proper notification; and 3) an opportunity for the students and parents to meet with the investigator.[26]

¶ 23 Here, Amy Cassell, an assistant at the OSSAA who processed Shelby's request (assistant), testified that she routinely reads the waiver documentation, asks questions of either school, if necessary, and then recommends to her superiors whether the waiver should be denied. In Shelby's case, because the form indicated that the parents had been involved in a dispute at the school, the assistant contacted the superintendent from Central High School—Mr. Tanner, the one who was directly involved in the altercation—to further inquire as to the nature of the dispute. After learning that the parents would not meet one-on-one with the superintendent, she recommended denial of the waiver.

¶ 24 The assistant did not contact Shelby or the parents because, as she testified, she does not work for the parents—she works for schools.[27] She also testified that she did not know that the superintendent was even involved in the matter until the appeal before the Board.[28] Finally, she testified that the reason the waiver was denied was merely because the father refused a one-on-one meeting with the superintendent.[29]

> Q. So basically you're telling me the hardship ruling was denied after the application was submitted and after you made one call to Mr. Tanner and then your recommendation was made?
> A. Yes? . . .

26. The OSSAA Constitution, § 6, see note 18, supra.

27. Trial Transcript of October 20, 2008, testimony of Assistant Amy Cassell provides in pertinent part at p. 82:

> . . . Q. But you never called Mr. Morgan and asked him if he in fact missed the opportunity to seek resolution?
> A. No, sir. I don't work for parents. I work for schools. So all my correspondence and dealings are with schools except with the exception of prior conversations I had with Mr. Morgan about another hardship waiver. He had called me several times about a previous hardship waiver. I know that he understands that he can call and talk to me if he wants to. I don't call parents.
> Q. I understand that you don't work for them. But you are trying to find out the truth, aren't you?
> A. Yes. Through the schools.
> Q. Did it ever occur to you that maybe the schools don't always tell you the truth?
> A. Well, no . . . .

28. Trial Transcript of October 20, 2008, testimony of Assistant Amy Cassell p. 82 provides:

> . . . Q. Did it ever come to your attention that Mr. Tanner was personally involved in this matter?
> A. Mr. Who?
> Q. Mr. Tanner. The person who you talked to at Central.
> A. Not until the board hearing, the due process hearing.

29. Trial Transcript of October 20, 2008, testimony of Assistant Amy Cassell provides in pertinent part at p. 81:

> . . . Q. Ms. Cassell, you never called Mr. Morgan and asked him about this. Excuse me, but it seems to appear that your initial determination and perhaps Mr. Grossman's arguments the way his questions are going and the brief we've gotten, that an awful lot of emphasis is placed on the fact that Mr. Morgan refused to make the most of an opportunity to seek resolution. Is that correct? There's a lot of emphasis placed on that fact by OSSAA?
> A. It would be a reason that I would deny the hardship waiver.
> Q. That's why you did?
> A. Yes . . . .

Trial Transcript of October 20, 2008, testimony of Assistant Amy Cassell provides in pertinent part at p. 84:

> . . . Q. This all goes back to whether her father sought to pursue an opportunity for resolution with Mr. Tanner?
> A. Actually from my perspective it all goes back to whether or not hardship waiver meets criteria or does not meet criteria. Those are the only two things I look at. My parameters are pretty narrow. In this situa-

¶ 25 The assistant forwarded her recommendation to her superior, who in turn, forwarded the recommendation to Executive Secretary. The Executive Secretary denied the application for the same reason as the assistant—because the father did not meet one-on-one with the superintendent. That was the only reason for the denial, which had nothing to do with Shelby directly.[30] Shelby was not the cause of the discord, nor could she have done anything to rectify the situation.[31]

> tion, I didn't see that the situation met our criteria for hardship waiver.
> Q.   That's because Mr. Morgan didn't seek an opportunity for resolution with Mr. Tanner?
> A.   Yes. . . .

**30.** Trial Transcript of October 20, 2008, testimony of Executive Secretary Danny Rennels provides in pertinent part at p. 99:

> . . .Q.   Can you explain to the Court why you reached that conclusion?
> A.   Again, it was from the situation of what was described as something that had occurred at a ball game.  It did appear that there had not been any resolution made to it.  With us having as large a number of situations that develop, it's impossible for us to be referee from a number of miles away.  Until there was something that was resolved at Central school, we could not see a reason for us to intervene and to approve the hardship waiver. . . .

**31.** Trial Transcript of October 20, 2008, testimony of Superintendent Max Tanner provides in pertinent part at pp. 141–43:

> . . .Q.   Shelby have any blame in this?
> A.   She did nothing. . . .
> Q.   How can Shelby help you get this reconciled?
> A.   I don't know that she can. . . .

Trial Transcript of October 20, 2008, testimony of Executive Secretary Danny Rennels provides in pertinent part p. 122:

> . . .Q   . . . .We're not talking about Joe and Darla, are we?
> A.   No, sir.
> Q.   The hardship belongs to the student, doesn't it?
> A.   That's correct.
> Q.   Did this student have anything to do with this problem that arose?
> A.   Not aware that she did, no sir.
> Q.   Would you agree with me that it certainly created a hardship?
> A.   It created a problem, sir. . . .

**32.** Trial Transcript of October 20, 2008, testimony of Assistant Amy Cassell provides in pertinent part at p. 85:

¶ 26 Nowhere in the OSSAA's rules is it stated that a reason to deny a hardship application is because the student quit the team or solely because of the parent's neglect in seeking a resolution of a conflict in a certain manner.[32]  The Executive Secretary did not notify the parents that this reason was the basis of the decision.  The parents did not learn this information until the cause was before the trial court.[33]  The Executive Secretary referred to this matter as a mere discontentment, but could not describe whether discontentment can rise to the level of hardship.[34]  Additionally, he stated that

> . . .Q.   By the way, in the rules somewhere for the OSSAA under this hardship waiver manual, does it say in there anywhere that if a parent doesn't seek resolution of a conflict that that is one of the bases on which the OSSAA should deny a hardship application?
> A.   Does it say that specifically?
> Q.   Yes, ma'am.
> A.   No. . . .

**33.** Trial Transcript of October 20, 2008, testimony of Executive Secretary Danny Rennels provides in pertinent part at pp. 111–112:

> . . .Q.   In your first denial, which we've already seen, does it state that that's the reason it was denied, that the hardship ruling was denied, was because the parents had failed to resolve the issue at the school?
> A.   No, sir, it did not say that.
> Q.   Is there anything in writing telling them what the problem was with their application?
> A.   No, sir.  It said it did not meet the criteria.
> Q.   Okay.  What criteria are we talking about if it's not in writing anywhere?  How were they supposed to know what they were even addressing in the appeal?
> A.   I would have assumed that the school at Sallisaw would have told them that.  That's what we would expect.
> Q.   The letter to you from the school or to Sallisaw simply says it didn't meet criteria for eligibility.  Does that letter indicate that it was because of Mr. Morgan failed to seek resolution of the problem or conflict with the sending school?
> A.   No, sir, it does not.
> Q.   It's not said anywhere, is it?
> A.   No sir . . . .

**34.** Trial Transcript of October 20, 2008, testimony of Executive Secretary Danny Rennels provides in pertinent part at p. 113:

> . . .A.   Our hardship criteria does cite one of the exceptions we will use to not consider is discontentment with the school where the student's eligibility has been established.  Our schools are very aware if there's a yes

the OSSAA simply does not have the staff or the resources to investigate an application any further than they did in this cause.[35]

¶ 27 According to the testimony of the Executive Secretary, the purposes of the transfer rule and the objectives of the OSSAA are not to place an overemphasis on athletics or to have students move merely to

seek a better coach, better opportunity, or better team. The rule serves two purposes: 1) to prevent recruitment of athletes;[36] and 2) to preclude transfer students from displacing existing team players.[37] Exceptions are allowed in certain circumstances when there is no evidence that the student was recruited.[38] Yet, nothing in the record suggests that Shelby was recruited or that she dis-

checked on that sending school form that they should be alert that there are other issues there. Certainly Sallisaw school being a member would have known that.

Q. Discontentment. I appreciate that. Mr. Grossman addresses that in his brief when he says this is discontentment, not hardship. When does discontentment rise to the level of hardship?

A. I'm not sure I can answer that.

Q. If you can't, who can? ...

35. Trial Transcript of October 20, 2008, testimony of Executive Secretary Danny Rennels provides in pertinent part at p. 92:

...A .... We act on approximately 1200 of these requests a year in writing of these hardship waivers. We receive a number of calls and questions concerning these type of issues ...

Trial Transcript of October 20, 2008, testimony of Executive Secretary Danny Rennels provides in pertinent part at pp. 94–95:

...A. There are a couple of reasons. We certainly take any input we can receive to help us resolve an issue. We have a board policy that states we give official responses to the schools and to the schools only. We will talk to counselors. We'll talk to parents. Anyone to help us gain the idea. The official response our board deems should be made to that school. We also will assume they would have some pertinent information that we would need to know when we're reviewing the case or any information.

Q. Do you depend on the schools to do a lot of the investigative work for you gathering up materials or information that you need in order to make a determination on hardship request?

A. It has to be that way. Again with the volume that we do, it would be impossible. I have four staff members that are assigned to work on these hardship waivers. That means they will process something over 300 apiece during a years period of time. There would be no way for a staff that size to evaluate those without school personnel help....

36. The OSSAA Hardship Waiver Manual, 2008–2009, § IV, p. 68, provides in pertinent part:

**IV. APPLICATION FOR EXCEPTION FROM INELIGIBILITY DUE TO UNAVOIDABLE HARDSHIP OR OTHER CIRCUMSTANCES**

As part of the overall effort to preserve equitable participation opportunities, and discourage overemphasis on athletics, to the detriment of other important educational programs, the Oklahoma Secondary Activities Association (OSSAA) has established certain rules governing eligibility.... (Emphasis in original.)

37. Trial Transcript of October 20, 2008, testimony of Executive Secretary Danny Rennels provides in pertinent part at pp. 90–91:

...Q. Can you explain to the Court how the particular rule ties in to the objectives and mission of the OSSAA?

A. Yes. I think the objective of the OSSAA is to not place an overemphasis on athletics or to have students moving for whatever reason there may be. The purpose and mission statement of the OSSAA. Student to be eligible at one place and anticipate there.

Q. You were here when Ms. Cassell talked about equitable opportunities to participate. Can you explain to the Court what that term would mean?

A. It would mean for students not to pile up on one team or to move to one team because of a better coach or a better opportunity or a better team to play again where the eligibility of our rules would place them.

Q. If students happen to all go—if good athletes decide to go to one particular school and put together a state championship team, what impact does that have on other students at that school?

A. Obviously, the other students at the school—any time you have an athlete that moves in, if they're a pretty good athlete, obviously someone is not going to participate because that student is there. You'll have a local situation that could occur. You also have a situation where the other teams participate against those students would be at a disadvantage because of that student participating when not eligible....

38. The OSSAA Hardship Waiver Manual, 2008–2009, § IV, p. 68, recognizes that in cases of foreign exchange students, transfers in the 7th and 8th grade, or instances where non-varsity participation is available, exceptions may be recognized "provided there is no evidence that the student was influenced to transfer schools for athletic purposes."

placed a starting player from the team.[39] In this cause, the purpose of the rule was not met by the decision to prohibit Shelby from playing.

¶ 28 In violation of its own due process guarantees provided by § 6 of its Constitution,[40] the OSSAA did not: 1) conduct an impartial investigation into the matter; or 2) properly notify the school, the parents, or the student, of the actual reason for the denial or tell them that they had an opportunity to meet with the investigator. The OSSAA's decision admittedly had nothing to do with Shelby, but was instead based on the fact that her parents refused to attend a meeting with someone directly involved in the incident without the school board present, their attorney present, or even a non-partial witness present. Shelby was not involved in a dispute with either the school or the coaches. Under these facts there are three conclusions the trial court should have reached: 1) the OSSAA's interpretation of this hardship exception was unreasonable; 2) the decision was arbitrary and capricious; and 3) the OSSAA acted in violation of its own due process rules and procedures. The trial court did not abuse its discretion in granting the injunction.

## CONCLUSION

¶ 29 Shelby played by the rules. The OSSAA did not. The rules require an impartial investigation. No such investigation was done. [Only one phone call was made—to the Superintendent who was involved in the dispute.] The OSSAA did not learn that the Superintendent was involved in the dispute until the matter came before the board hearing. The rules require proper notification.

**39.** Shelby testified that the transfer had nothing to do with athletics. The Trial Transcript of October 20, 2008, testimony of Shelby Morgan provides in pertinent part at p. 12:

...Q. Was that—was your desire at that time, Shelby to transfer for the sake of athletics?
A. No.
Q. What was it all about?
A. I needed to get away, I think, from the school board members and Max Tanner because it was affecting me also academically.
Q. As a matter of fact, I think you told the Court you decided that you would just go to school there and not play sports?

No notice was given. The parents did not learn the actual reason for the denial of the hardship application until the matter came before the trial court. The rules require an opportunity to meet with the investigator. This never happened.

¶ 30 It is disturbing that an association which sets forth rules to promote good sportsmanship totally ignored the rules it adopted—the rules of the game. The trial judge was right when he said to Shelby at the conclusion of the hearing:

"The reality of it is, though, you didn't do anything wrong. You need to play ball. They should be ashamed of themselves because you're not playing ball where you want to play ball."

An arbitrary and capricious decision was reached, not by the trial court, but by the OSSAA. I would affirm the trial court.

## *APPENDIX A*

## REQUEST FOR OSSAA HARDSHIP ELIGIBILITY CLARIFICATION

*Must be completed by the voting delegate or principal of receiving school*

**Check if student is overage.** ☐

**Applying for additional semester(s)** ☐

*FOR OFFICE USE*

_____Approved

_____Disapproved

_____Criteria

_____Initial

Name of Student_____

School Attending_____

Date of first attendance_____

A. Yes.
Q. In all fairness, was this just an attempt on your part to go somewhere else to play ball?
A. It was better for me mentally and emotionally....

At pp. 13–14:

...Q. By any stretch of the imagination, was all of this concocted or put together just so you could go to Sallisaw and play ball?
A. No....

**40.** The Oklahoma Secondary School Activities Association Constitution § 6, see note 18, supra.

Date enrolled_____

Date of Birth_____

Age____

Grade in school for which eligibility is requested. (Circle) 7 8 9 10 11 12

Is applicant a legal student in your district? Yes ☐ No ☐ Tuition__Transfer__Guardianship__Other_____

School district in which legal address of student is located_____

Residence Address_____

Home Telephone_____

With whom is student living (relationship)?_____

Did the student participate in any sport at the last school attended? Yes ☐ No ☐ Student's Height____ Weight_____

What is the student's best sport? _____ Ability is below average__Average__Outstanding__

What is the student's next best sport?_____Ability is below average__Average__Outstanding__

**List school(s) attended in previous years with corresponding dates:**

7th_____

(Year) (School)

8th_____

(Year) (School)

9th_____

(Year) (School)

10th_____

(Year) (School)

11th_____

(Year) (School)

12th_____

(Year) (School)

If eligibility is denied, do you intend to continue attendance at the school requesting eligibility?_____

*Principal or Voting Delegate should initial the following questions prior to sending the request to the OSSAA office.*

1. _____ I have reviewed the hardship waiver process with the family prior to this waiver being sent to the OSSAA office.

2. _____ I have completed and included the *New Student Form* with this request.

3. _____ I have contacted the previous school and they have sent the athletic eligibility information form to us and we have included it with this request. (This applies to out-of-state and non-member schools.)

4. _____ I have included all background information as is requested to properly render a decision concerning this request.

5. _____ This request is based on the criteria # _____ (Refer to hardship criteria listed on pages 69, 70, & 71)

6. _____ Signatures of *all parties* appear on the *Hardship Eligibility Form* and on the *New Student Form.*

7. _____ I understand that incomplete information submitted on the hardship forms will result in the hardship being denied due to lack of information.

8. _____ I understand that incorrect information could cause eligibility to be revoked and could result in the forfeiture of contest(s) in which the student participated and other penalties imposed if deemed necessary.

*Note:* **Questions not initialed will be viewed as incomplete and may cause hardship to be denied due to lack of information.**

Student's signature_____

Date_____

Parent(s) or legal guardian's signature_____

Case submitted by:_____

(Voting Delegate or Principal—**PLEASE PRINT**)

Title_____

Telephone_____

PRINCIPAL'S OR VOTING DELEGATE'S SIGNATURE_____

SCHOOL *MAILING* ADDRESS_____ZIP_____

(Please provide *complete* school address on *every* hardship request.)

**SHOULD THIS HARDSHIP BE DE-NIED, DUE PROCESS RIGHTS AND PROCEDURES CAN BE FOUND BY REFERRING TO THE *OSSAA ADMINIS-TRATORS' HANDBOOK* UNDER CON-STITUTION SECTION 6.**