2013 OK 84

Brayden SCOTT, Appellant,

v.

OKLAHOMA SECONDARY SCHOOL
ACTIVITIES ASSOCIATION,
Appellee.

No. 111,226.

Supreme Court of Oklahoma.

Oct. 1, 2013.

Chadwick Smith, Tahlequah, Oklahoma, for Appellant.

Mark S. Grossman, Oklahoma City, Oklahoma, Todd Hembree, Tahlequah, Oklahoma, for Appellee.

KAUGER, J.

¶ 1 The questions presented on appeal are whether the district court: 1) applied the incorrect standard of review in determining whether the actions of the Oklahoma Secondary School Activities Association (OSSAA) warranted the issuance of a permanent injunction; and 2) erred in its determination that there was no substantial likelihood of Petitioner Brayden Scott (Scott) prevailing on his claim that the OSSAA acted in an arbitrary and capricious manner. We hold that the district court erred in applying the wrong standard of review, and that, under any standard, the district court erred by failing to find Scott had a substantial likelihood of prevailing on his claim that the OSSAA acted in an arbitrary and capricious manner.

## FACTS

¶ 2 Scott is a former student at Sequoyah School (Sequoyah) in Tahlequah, Oklahoma, a federal Indian boarding school operated by the Cherokee Nation. At the time the events giving rise to this cause occurred, Scott was a senior at Sequoyah and quarterback of the varsity football team. Respondent OSSAA is an association that regulates interscholastic sports competition in Oklahoma. It identifies itself as a voluntary association of Oklahoma secondary schools that regulates the interscholastic activities of member schools which serves to ensure that desired educational goals are not short-changed by an overemphasis on athletics.[1]

¶ 3 In July of 2012, the OSSAA apparently received a copy of a newspaper article concerning Sequoyah's successes attracting the attention of college football recruiters.[2] Based on comments made in the article, the OSSAA became concerned that Sequoyah might have violated what the OSSAA considered to be its long-standing prohibition on member schools paying for their student-athletes to attend individual athletic camps. The OSSAA notified the school of its concerns and asked for confirmation as to whether Sequoyah had paid for selected students to attend individual camps. The OS-SAA alleges it received no response prior to September 10, 2012.[3] At that point it received a response from Coach Brent Scott offering somewhat vague answers to its request for more information.[4]

¶ 4 Concerned that multiple students might be ineligible due to violations and yet still participating in games during the season, the OSSAA sought specific details about which students might have attended camps and had their tuition paid by either Sequoyah or sources that were not their own family, such as parents of other students. Despite apparently stressing the urgency of its requests, the OSSAA did not receive any more information from the head coach until Sequoyah, in a letter dated September 27, 2012, instructed Coach Brent Scott to respond to the OSSAA's request by 8:00 a.m. the next morning.[5]

¶ 5 October 16, 2012, appears to be the date on which the OSSAA was first able to confirm the identities of students for whom Sequoyah had paid tuition or fees for individual football camps and the camps that had been attended at school expense from 2009 to 2012. This information was provided to the OSSAA in a letter and attached spreadsheet sent by the Sequoyah Athletic Director.[6]

1. OSSAA Constitution, 2012–2013, Article II–Purposes, r. 35.

2. *Letters Galore*, Kolby Paxton, Tahlequah Daily Press, May 4, 2012, r. 50.
   Apparently quoting Scott, the article states:
   "Some people just don't know, I don't think," said Scott. "This is our world. My dad can get anyone recruited. If the kid is willing to do what he says, and the opportunities are made available, he will get recruited. I don't want to put it all on my dad's shoulders, but he knows a lot about this. The great thing about this school is that they have always allowed for that. We don't have to pay to go to a lot of these camps that are getting our guys scholarships. We don't go somewhere without a purpose. There is a purpose for every team camp, every individual camp. If we're there, and the right people see us, there is a huge benefit to that. You can't [sic] recruited by someone that never gets to see you."

3. OSSAA Report on Violations at Sequoyah High School Associated with Payment of Expenses for Individual Athletic Camps—November 6, 2012, r. 110.

4. September 10, 2012 Letter from Brent Scott, r. 132.

Coach Scott's letter stated, in part:
   A lot of camps we attend are free ... In addition to the camps our team attends, our staff works more than one season in lieu of payment. This provides an opportunity for our players to attend free or at a pro rated fee. Other examples, aside of our staff working camps to ensure free or pro rated fees, include but not limited to the following: we have parents who will pay for not only their child but other players as well, players who work in our Sequoyah program use money earned to pay for their camps and finally, we have an incentive program which allows camp fees to be paid on behalf of the players if or when they reach the goals set for them....

5. Letter from Sequoyah Athletic Director Marcus Crittenden to Coach Brent Scott, September 27, 2012, r. 133.

6. Letter from Sequoyah Athletic Director Marcus Crittenden to Ed Sheakly, October 16, 2012, r. 142–145.

¶ 6 On October 22, 2012, OSSAA Executive Director Sheakly spoke on the phone with Sequoyah's Athletic Director about the possible ineligibility of several students, including Scott, as well as the head football coach. The exact details of the conversation are disputed. Scott alleged that the OSSAA declared him and other students ineligible at that point.[7] The OSSAA alleged that it informed Sequoyah that it expected the players in question and the coach would be held out of competition in order to avoid possible future violations and attached sanctions.[8] Regardless, on this date the OSSAA considered Scott and certain of his fellow players ineligible to play, and the head coach ineligible to coach, based on what it considered to be violations of its rules and policies concerning tuition payment for participation in individual camps. Sequoyah's athletic director apparently conceded the violations and announced it was suspending the head coach, but he thought that the players should be allowed to continue to participate because they were blameless. At this point there were only two games remaining in the regular season, scheduled for October 26 and November 2, 2012.

¶ 7 One of Scott's teammates, through his parent and attorney, sought relief in the District Court of Cherokee County on October 25, 2012, by filing a Verified Petition and Application for Temporary Restraining Order and/or Temporary Injunction. The player argued that even though administrative remedies had not been exhausted, an administrative appeal would not take place until after the end of the player's senior season and irreparable harm would result. In a Temporary Restraining Order issued on October 25, 2012, the court ordered the OSSAA to refrain from enforcing its determination of ineligibility for not just the represented player, but for Scott and all other players as well as the head coach, so that they could finish the regular season. The day after the issuance of the Temporary Restraining Order,

Scott moved to intervene in the litigation as a plaintiff, and was permitted by the court to do so.

¶ 8 Meanwhile, the OSSAA continued its investigation, interviewing students and parents in the course of an attempt to obtain more detailed information. After conducting the investigation, on November 3, 2012, the Executive Director of the OSSAA directed that Sequoyah forfeit each of the wins in the current season, instructed that Sequoyah was not to participate in the state football playoffs, and also directed that the head coach (already on suspension by Sequoyah) not participate in coaching until reinstated by the OSSAA's Board of Directors.[9] Sequoyah and the head coach were notified that the determinations could be appealed at the upcoming Board of Director's meeting on November 7, 2012. On November 6, 2012, OSSAA Staff issued a twenty-page report concerning its investigation, its findings regarding the student-athletes' participation in camps, and recommended sanctions. The OSSAA Board adopted the findings and all but one of the proposed penalties.

¶ 9 In response to the OSSAA's November 3 decision, on November 7, 2012, the same day as the OSSAA's Board Meeting, Scott petitioned the district court for a declaratory judgment and permanent injunction, to prevent the OSSAA from enforcing its ruling and to allow Scott and his affected teammates to participate in the 2012 state football championships. Sequoyah announced it would not contest the OSSAA's final decision and it did not join in Scott's petition for a permanent injunction. The district court denied Scott's request for a permanent injunction.

¶ 10 On November 9, 2012 (the day the state football playoffs were to begin), Scott filed an Application for Original Jurisdiction and Petition for an Emergency Writ of Mandamus, as well as a Petition in Error also requesting a writ of mandamus be issued in this Court, ordering the district court to issue an injunction against the OSSAA. We

7. Appellant's Brief In Chief, p. 13.

8. OSSAA Report on Violations at Sequoyah High School Associated with Payment of Expenses for Individual Athletic Camps—November 6, 2012, r. 112.

9. Letter from Ed Sheakley to Marcus Crittenden, November 3, 2012, r. 157–161.

denied Scott's Application for an Emergency Writ of Mandamus on November 9, 2012, and on November 29, 2012, recast Scott's Petition in Error as an appeal from a final order of the district court.

¶ 11 On December 12, 2012, we issued a show cause order inquiring why the appeal should not be dismissed as abandoned. Scott responded on December 28, 2012, and this Court permitted the appeal to continue on January 3, 2013. On January 11, 2013, Scott moved to stay his appeal pending final disposition of his request for a declaratory judgment in the trial court, which this Court denied on March 14, 2013. The OSSAA moved to dismiss the appeal for mootness on January 25, 2013, and the motion was denied on March 11, 2013. On May 14, 2013, Scott filed a motion to retain the appeal in this Court, which was granted on June 26, 2013. This cause was assigned to this office on June 26, 2013.

¶ 12 On appeal, Scott argues that the District Court erred when it denied his request for a permanent injunction against the OSSAA on November 8, 2012, because: 1) it exercised the improper standard of judicial review by giving absolute deference to the OSSAA's decisions; and 2) it found he had no likelihood of succeeding on his claim that the OSSAA acted in an arbitrary, capricious, and unreasonable manner.

## I.

### The District Court Erred in Applying the Wrong Standard of Review, but Under any Standard, the District Court Erred by Failing to Find Scott had a Substantial Likelihood of Prevailing on his Claim that the OSSAA acted in an Arbitrary and Capricious Manner.

#### A.

### This Matter Falls Within Long–Standing Exceptions to the Mootness Doctrine.

¶ 13 The OSSAA asserts that this appeal should be dismissed as moot and unripe for appellate review. The OSSAA acknowledges that this Court denied a similar motion on March 11, 2013, but that it did so without specifically stating that the denial was with prejudice to refiling. The OSSAA now asks the Court to once again examine the issue, and asserts that Scott's motion for a permanent injunction, denial of which is the sole subject for this appeal, was addressed specifically to Scott's high school athletic eligibility and the exclusion of Sequoyah's football team from the 2012 state playoffs. It is undisputed that the playoffs are now over, and that by graduating and enrolling in college, Scott will never again attend an OSSAA-member school or be subject to its rules regarding eligibility. He can no longer benefit from the injunctive relief he originally sought.

¶ 14 Oklahoma recognizes two exceptions to the mootness doctrine: 1) when the appeal presents a question of broad public interest; and 2) when the challenged event is capable of repetition, yet evading review.[10] Exceptions to the mootness doctrine are not fixed, and their application depends on the facts presented and the policy considerations.[11]

¶ 15 The OSSAA's interpretation of its policies affects a great many athletic programs, because of the sphere of influence it possesses over secondary school sporting competition. The ability of students to participate in athletics is important to potential college and professional careers, and it is a matter of great public import. Questions regarding student eligibility to participate in sporting events occur often, but because of the short window between questions arising and the occurrence of the events in question, judicial review of the OSSAA's decisions prior to the occurrence of those events can be difficult. That is precisely what occurred here. If controversies regarding the OSSAA's decisions concerning eligibility were to become moot

---

10. *State ex rel. Oklahoma Firefighters Pension and Retirement System v. City of Spencer,* 2009 OK 73, ¶ 4, 237 P.3d 125; *Payne v. Jones,* 1944 OK 86, ¶¶ 3–5, 193 Okla. 609, 146 P.2d 113; *Peppers Refining Co. v. Corporation Commission,* 1947 OK 128, ¶ 4, 198 Okla. 451, 179 P.2d 899.

11. *In Re: Guardianship of Doornbos,* 2006 OK 94, ¶ 4, 151 P.3d 126 (We will only apply those exceptions where the practical considerations indicate that doing so would avoid, rather than prolong, confusion.).

each time merely because the events in question had already occurred, all the OSSAA would need to do to perpetually evade review of its actions is to delay a decision until the event occurs. Clarification regarding the proper standard of review for decisions made by the OSSAA is necessary to avoid continuing confusion regarding disputes over student eligibility.

## B.

**The Proper Standard of Review for Decisions of the OSSAA is that Provided by the Administrative Procedures Act, 75 O.S.2011 § 322.**

¶ 16 Granting or denying injunctive relief is generally within the sound discretion of the trial court and judgments issuing or refusing to issue an injunction will not be disturbed on appeal unless the lower court has abused its discretion or its decision is clearly against the weight of the evidence.[12] An action for an injunction is one of equitable cognizance and this Court will consider all of the evidence on appeal.[13] In order to determine whether there was an abuse of discretion, a review of the facts and the law is essential.[14] The fact issue involves whether the ruling reviewed is without a rational basis in the evidence to support the decision.[15] The law issue concerns whether the ruling is based upon an erroneous legal conclusion.[16] On appeal, Scott argues that the trial court committed an error of law by applying an overly-deferential standard of review to actions taken by the OSSAA in making its decision whether to grant a permanent injunction. We agree.

¶ 17 In a hearing before the trial court on November 8, 2012, regarding Scott's Motion for a Permanent Injunction, it indicated it found this Court's decision in *Morgan v. Secondary School Activities Ass'n*, 2009 OK 21, 207 P.3d 362 to be persuasive regarding the deference due a voluntary association's interpretation of its own rules and policies.

¶ 18 In *Morgan*, supra, the OSSAA sought review of an order of the district court enjoining it from enforcing its determination that a high school basketball player was ineligible to participate in varsity athletics under the OSSAA's rules following a voluntary transfer to another school. This Court held:

> It is fundamental that voluntary unincorporated associations such as the Oklahoma Secondary School Association, through their members, are free to adopt rules that govern their interaction and that they are free to enforce those rules without undue interference by the courts.[17]

As a result, the Court stated:

> . . . [C]ourts should not intervene except to ascertain whether association proceedings are conducted pursuant to the rules and laws of the organization, in good faith and lawfully. Absent fraudulent, collusive, unreasonable, arbitrary or capricious behavior, this Court may not overturn a voluntary association's enforcement of its rules.[18]

¶ 19 *Morgan*, supra, is part of a long series of cases going back to 1938 in which this Court has reinforced the notion of judicial deference to the actions of the OSSAA in the exercise of its authority to establish and enforce its rules controlling students' athletic

---

12. *Sharp v. 251st Street Landfill, Inc.*, 1996 OK 109, ¶ 4, 925 P.2d 546; *Johnson v. Ward*, 1975 OK 129, ¶ 42, 541 P.2d 182; *Leathers v. Commercial National Bank in Muskogee*, 1965 OK 200, ¶ 15, 410 P.2d 541.

13. *Bd. of Regents of University of Oklahoma v. National Collegiate Athletic Ass'n*, 1977 OK 17, ¶ 3, 561 P.2d 499.

14. *Bd. of Regents of University of Oklahoma v. National Collegiate Athletic Ass'n*, see note 13, supra at ¶ 3.

15. *Thomas v. E–Z Mart Stores, Inc.*, 2004 OK 82, ¶ 7, 102 P.3d 133; *Tibbetts v. Sight'n Sound*

*Appliance Centers, Inc.*, 2003 OK 72, ¶ 3, 77 P.3d 1042.

16. *Thomas v. E–Z Mart Stores, Inc.*, see note 15, supra; *Tibbetts v. Sight 'n Sound Appliance Centers, Inc.*, see note 15, supra at ¶ 4.

17. *Morgan v. Oklahoma Secondary School Activities Ass'n*, 2009 OK 21, ¶ 17, 207 P.3d 362.

18. *Morgan v. Oklahoma Secondary School Activities Ass'n*, see note 17, supra at ¶ 19 (quoting *Brown v. Oklahoma Secondary School Activities Ass'n*, 2005 OK 88, ¶ 10, 125 P.3d 1219).

eligibility.[19]  Aside from deference to the OSSAA regarding interpretation of its own rules, *Morgan*, supra, also held that no vested right to "eligibility" existed.  The Court stated:

> [t]he plaintiff has many rights as a citizen and as a high school student, but he has no vested right in "eligibility" as dealt with at such great length in the rules of the Oklahoma High School Athletic Association.

¶ 20 *Morgan*, supra, and prior decisions are predicated on the notion that the OSSAA is truly a voluntary association.  Even when this Court decided *Morgan*, in 2009, there was some doubt as to whether the OSSAA could accurately be called "voluntary" in a traditional sense.  The dissent noted that:

> While the term "voluntary" is used in our prior decisions—for students—the term is a misnomer.  A school is required be [sic] a member of the OSSAA to participate in state-wide interscholastic athletic events.  Students who want to be involved in athletics and who might even choose athletics as

a career are required to be bound by the OSSAA rules and procedures if their school is a member and if they want to play sports.  In this sense, it is not truly "voluntary" as the term suggests.[20]

¶ 21 There are several possible meanings for the term voluntary.[21] The common thread is that for a decision, such as a decision to join an association, to be voluntary, it must be unconstrained by outside interference and done without valuable consideration or legal obligation.[22]  Implicit in *Morgan*, supra, is that the unique treatment of voluntary associations stems from the decision to join them being voluntary—this is what makes them voluntary associations.[23]  The OSSAA cannot be a voluntary association if the decision on the part of its member schools to join is not truly voluntary.

¶ 22 Pursuant to the OSSAA Constitution, member schools may only participate in athletic competition with other member schools of the OSSAA, with schools that are members of associations in other states, or

---

19.  *Morgan v. Oklahoma Secondary School Activities Ass'n*, see note 17, supra at ¶ 18, summarizes the prior decisions on which the *Morgan* Court relied:

> *Morrison v. Roberts*, 1938 OK 458, 183 Okla. 359, 82 P.2d 1023 (extraordinary relief granted by trial court would not lie against athletic association's enforcement of its order declaring student ineligible for one year for violation of its rule prohibiting acceptance of award); *Oklahoma Secondary School Activities Association v. Midget*, 1972 OK 154, 505 P.2d 175 (injunctive relief not warranted to prevent Association's enforcement of violation of eligibility rules by declaration of forfeiture of football game); *Mahan v. Agee*, 1982 OK 116, 652 P.2d 765 (injunctive relief not warranted for Association's denial of student's application for waiver of age eligibility rule based on alleged hardship); *Mozingo v. Oklahoma Secondary School Activities Association*, 1978 OK CIV APP 8, 575 P.2d 1379 (injunctive relief not warranted for Association's denial of requests by two football players for hardship exceptions to application of Rule 8); *Brown v. Oklahoma Secondary School Activities Association*, 2005 OK 88, 125 P.3d 1219 (injunctive relief not warranted to prohibit Association from enforcing its order suspending athlete from participation in two football games for unsportsmanlike conduct).

20.  *Morgan v. Oklahoma Secondary School Activities Ass'n* (Kauger, J., with whom Hargrave and Reif, JJ., joined, dissenting), see note 17, supra at ¶ 19.

21.  Black's Law Dictionary (9th ed.2009), voluntary, provides:

> **VOLUNTARY**
> **voluntary**, *adj.* (14c) **1.** Done by design or intention <voluntary act>. **2.** Unconstrained by interference; not impelled by outside influence <voluntary statement>. **3.** Without valuable consideration or legal obligation; gratuitous <voluntary gift>. **4.** Having merely nominal consideration <voluntary deed>.— **voluntariness,** *n.*

Merriam–Webster's Dictionary, voluntary, *available at:* http://www.merriam-webster.com/dictionary/voluntary, defines voluntary as:

> **1:** proceeding from the will or from one's own choice or consent
> **2:** unconstrained by interference: SELF–DETERMINING
> **3:** done by design or intention: INTENTIONAL <*voluntary* manslaughter>
> **4:** of, relating to, subject to, or regulated by the will <*voluntary* behavior>
> **5:** having power of free choice
> **6:** provided or supported by voluntary action <a *voluntary* organization>
> **7:** acting or done of one's own free will without valuable consideration or legal obligation

22.  See definitions of voluntary, note 21, supra.

23.  *Morgan v. Oklahoma Secondary School Activities Ass'n*, see note 17, at ¶ 17.

with amateur teams and school teams not eligible for membership in any association.[24] This means that OSSAA member schools are not permitted to engage in athletic competition with Oklahoma secondary schools that are eligible to join the OSSAA but decline to do so. Put another way, an Oklahoma secondary school must join the OSSAA to compete with any of its approximately 491 member schools. Should the school desire the value and enrichment its families and students receive from interscholastic competition, it effectively has no choice but to join the OSSAA. In exchange for joining a school receives extremely valuable consideration: the ability of its students to participate in interscholastic athletics in Oklahoma with their peers at other schools. Functionally, membership in the OSSAA is not a choice but a requirement, lest students flee the district in droves for districts where they can participate in athletics.

¶ 23 The notion that the OSSAA might not really fit within the definition of a voluntary association was reinforced in a different manner by the Court of Appeals for the Tenth Circuit, in *Christian Heritage Academy v. Oklahoma Secondary School Activities Association*, 483 F.3d 1025 (10th Cir.2007). In that case, the court concluded that the OSSAA was subject to the Fourteenth Amendment, because it was a state actor.[25] The court held that the OSSAA's conduct constituted state action because of the pervasive entwinement of public institutions and public officials in its composition and workings.[26] As a result, the Court of Appeals for the Tenth Circuit held that the OSSAA's requirement of majority approval for admission of non-public schools (a different rule than for public schools), violated the equal protection clause of the Fourteenth Amendment.[27]

¶ 24 Regarding due process claims, however, the court in *Christian Heritage Academy*, supra, held that due process arguments were not properly preserved on appeal and also that Christian Heritage had not identified a property or liberty interest at stake, which is necessary for advancing a due process claim.[28] While Scott has spent a great deal of time asserting a Fourteenth Amendment due process claim, he appears to have failed to address the principle that the Due Process Clause is implicated only when a constitutionally protected interest is at stake.[29] In fact, the Tenth Circuit has previously indicated that athletic participation is not a constitutionally protected interest.[30] In

**24.** The OSSAA Constitution, 2012–2013, Article VI–Interscholastic Activities, r. 40, provides:

**ARTICLE VI–INTERSCHOLASTIC ACTIVITIES**

Section 1. A member of the Oklahoma Secondary School Activities Association may compete with member schools in good standing in this Association, or in Secondary School Associations in other states, provided that in interstate contests, the schools concerned shall follow the rules, policies and procedures of their respective associations.

Section 2. A member school of this Association may compete with amateur teams and school teams (government, private, state and parochial) not eligible for membership in a secondary school association, subject to the restrictions provided in the rules of the Association

Section 3. No school may participate in any event or activity without the specific approval of the secondary school principle or superintendent.

**25.** *Christian Heritage Academy v. Oklahoma Secondary School Activities Association*, 483 F.3d 1025, 1030 (10th Cir.2007).

**26.** *Christian Heritage Academy v. Oklahoma Secondary School Activities Association*, see note 25, supra at 1030. The court elaborated:

> OSSAA members are 98 percent public schools.... All fourteen of OSSAA's current directors are public school employees, and Oklahoma has authorized OSSAA to determine athletic eligibility and hold play-off games.

**27.** *Christian Heritage Academy v. Oklahoma Secondary School Activities Association*, see note 25, supra at 1030.

The Court did not address the merits of Christian Heritage Academy's Due Process claim because Christian Heritage Academy conceded that it had not identified a property or liberty interest at stake, which was necessary for advancing such a claim. *Christian Heritage Academy v. Oklahoma Secondary School Activities Association*, see note 25, supra at 1031.

**28.** *Christian Heritage Academy v. Oklahoma Secondary School Activities Association*, see note 25, supra at 1031

**29.** Appellee's Answer Brief, P. 12.

**30.** *Seamons v. Snow*, 84 F.3d 1226, 1234–35 (10th Cir.1996).

this regard, the Tenth Circuit is in accord with this Court's previous determination that a student's participation in interscholastic athletics is not a right but a privilege.[31] We decline to depart from that determination today.

¶ 25  However, Fourteenth Amendment claims aside, Scott argues that because the Tenth Circuit has declared the OSSAA to be a state actor, its decisions should be subject to the standard of review applicable to decisions of state agencies under the Administrative Procedures Act (APA), 75 O.S.2011 § 322.[32] This Court has not previously held that the APA is applicable to the OSSAA.

■ ¶ 26  The standard of review applicable to agencies pursuant to the APA, 75 O.S.2011 § 322, while similar in some respects, is different than that required by *Morgan,* supra. Under § 322, an agency's order will be affirmed if the record contains substantial evidence in support of the facts upon which the decision is based, and if the order is otherwise free of error.[33] An order is subject to reversal if an appealing party's substantial rights were prejudiced because the agency's findings, inferences, conclusions or decisions were entered in excess of its statutory authority or jurisdiction, were arbitrary or capricious, or were clearly erroneous in view of the reliable, material, probative and substantial competent evidence.[34]

¶ 27  The OSSAA is not truly a voluntary association. As this Court stated very recently in *Wright City Public Schools v. Oklahoma Secondary School Activities Ass'n,* 2013 OK 35, ¶ 18, 303 P.3d 884, most public and private schools in Oklahoma are members of the OSSAA.[35] At the time of that decision membership was about 481 secondary schools.[36] It is difficult to argue that the OSSAA is not effectively in almost complete control of secondary school athletic competition between public school students in the state of Oklahoma. The OSSAA is given specific authority over eligibility in certain circumstances by the statutes.[37] Nor is that the only place that the OSSAA is mentioned

---

31.  *Morgan v. Oklahoma Secondary School Activities Ass'n,* see note 17, supra at ¶ 16.

32.  Title 75 O.S.2011 § 322 provides:
(1) In any proceeding for the review of an agency order, the Supreme Court or the district or superior court,[1] as the case may be, in the exercise of proper judicial discretion or authority, may set aside or modify the order, or reverse it and remand to the agency for further proceedings, if it determines that the substantial rights of the appellant or petitioner for review have been prejudiced because the agency findings, inferences, conclusions or decisions, are:
    (a) in violation of constitutional provisions; or
    (b) in excess of the statutory authority or jurisdiction of the agency; or
    (c) made upon unlawful procedure; or
    (d) affected by other error of law; or
    (e) clearly erroneous in view of the reliable, material, probative and substantial competent evidence, as defined in Section 10 of this act,[2] including matters properly noticed by the agency upon examination and consideration of the entire record as submitted; but without otherwise substituting its judgment as to the weight of the evidence for that of the agency on question of fact; or
    (f) arbitrary or capricious; or
(g) because findings of fact, upon issues essential to the decision were not made although requested.
(2) The reviewing court, also in the exercise of proper judicial discretion or authority, may remand the case to the agency for the taking and consideration of further evidence, if it is deemed essential to a proper disposition of the issue.
(3) The reviewing court shall affirm the order and decision of the agency, if it is found to be valid and the proceedings are free from prejudicial error to the appellant.

33.  *Oklahoma Dept. of Public Safety v. McCrady,* 2007 OK 39, ¶ 10, 176 P.3d 1194; *Franco–American Charolaise, Ltd. v. Oklahoma Water Resources Bd.,* 1990 OK 44, ¶ 1 n. 4, 855 P.2d 568.

34.  *Oklahoma Dept. of Public Safety v. McCrady,* see note 33, supra.

35.  Specifically, we stated that they are voluntary members but clarified in fn. 1 that the public/voluntary nature of the OSSAA was not challenged in the court below and so was not fairly subsumed in the factual and legal issues dispositive of that appeal.

36.  *Wright City Public Schools v. Oklahoma Secondary School Activities Ass'n,* 2013 OK 35, ¶ 18, 303 P.3d 884.

37.  Title 70 O.S.2011 § 8–103.2 provides:
Except as otherwise provided, a student who enrolls, pursuant to the Education Open Transfer Act or pursuant to Section 2 of this act, in a school district in which the student is not a resident shall not be eligible to participate in school-related extramural athletic competition

in the statutes: 70 O.S.2011 § 24–155 requires that school district boards of education work with the OSSAA to develop guidelines to help prevent head injury in youth sports.[38] Title 70 O.S.2011 § 24–131.2 grants school administrative officers authority to order persons interfering with the conduct of sanctioned athletic events to leave the premises.[39] For purposes of that section, a "sanctioned athletic event" is defined as an athletic contest or sporting event sanctioned by the Oklahoma Secondary School Activities Association.[40]

¶ 28 In many respects the OSSAA already behaves like a state agency and adheres to requirements provided by statute. The OSSAA Constitution provides that the Board of Directors is required to develop procedures similar to those required by Oklahoma State Law for public school funds in order to track receipt and expenditure of OSSAA funds.[41] The OSSAA Constitution also specifies that its meetings shall be conducted pursuant to "the Open Meeting Law of the State of Okla-

governed by the Oklahoma Secondary School Activities Association for a period of one (1) year from the first day of attendance at the receiving school unless the transfer is from a school district which does not offer the grade the student is entitled to pursue. If the student is granted an emergency transfer pursuant to Section 8–104 of this title, was granted a transfer for any reason prior to January 1, 2000, or enrolls pursuant to the Education Open Transfer Act and qualifies for a hardship waiver pursuant to the rules of the Oklahoma Secondary School Activities Association, eligibility to participate in school-related extramural athletic competition shall be determined by the Oklahoma Secondary School Activities Association. (internal citations omitted).

**38.** Title 70 O.S.2011 § 24–155(A) provides:

A. Each school district board of education shall work in cooperation with the Oklahoma Secondary School Activities Association to develop the guidelines and other pertinent information and forms to inform and educate coaches, youth athletes, and their parents or guardians of the nature and risk of concussion and head injury, including continuing to play after concussion or head injury. On an annual basis, a concussion and head injury information sheet shall be completed and returned to the school district by the youth athlete and the athlete's parent or guardian prior to the youth athlete's participation in practice or competition.

**39.** Title 74 O.S.2011 § 24–131.2 provides:

A. The chief administrative officer or the chief administrative officer's designee to maintain order at a secondary school shall have the authority and power to direct any person to leave the premises of that secondary school, who, during the period of a sanctioned athletic event, after having been personally and specifically warned by the officer or the designee to refrain from such conduct, commits an act which materially and substantially interferes with the peaceful conduct of a sanctioned athletic event, including:
1. Projecting in any manner an object which could cause bodily harm to another person;

2. Entering the physical boundaries designated for the conduct of a sanctioned athletic event for the purpose of materially and substantially disrupting or interfering with the event;
3. Threatening to kill or do bodily harm to any person with apparent ability to carry out that threat during the period of a sanctioned athletic event; or
4. Using violent, obscene, indecent, or profane language in a manner which materially and substantially interferes with the peaceful conduct of a sanctioned athletic event.
B. Any person who fails to leave the premises of the secondary school as directed, may, upon application by the secondary school, be enjoined from entering upon or remaining upon the premises during the period of a sanctioned athletic event for the remainder of the school year or for so long as the court may provide. The procedure governing the application for injunction shall be the procedure for civil injunctions set forth in Title 12 of the Oklahoma Statutes.
C. Any person who knowingly and willfully fails to obey a direction to leave the premises of the secondary school shall be guilty of a misdemeanor.
D. This section shall not apply to competitors in a sanctioned athletic event, their coaches, or officials, accredited by the Oklahoma Secondary School Activities Association, who are participating in the event.

**40.** Title 70 O.S.2011 § 24–131.1 provides in pertinent part:

As used in Section 2 of this act:....
4. "Sanctioned athletic event" shall mean an athletic contest or sporting event sanctioned by the Oklahoma Secondary School Activities Association....

**41.** OSSAA Constitution, 2012–2013, Art. IV, § 5(d) provides:

The Board of Directors shall develop procedures similar to those contained by the Oklahoma State Law governing accounting of public school activity funds, as a guide for record keeping in all recipes and expenditures of Association funds.

homa." [42]

¶ 29 These examples serve to illustrate how all-pervasive a force the OSSAA is in secondary school athletic competition in Oklahoma. In 1977, this Court examined, and found appropriate, judicial scrutiny into the internal matters of another allegedly voluntary association, the NCAA. In *Bd. of Regents of University of Oklahoma v. National Collegiate Athletic Ass'n*, 1977 OK 17, 561 P.2d 499, this Court stated:

Courts are normally reluctant to interfere with the internal affairs of voluntary membership associations, however, in particular situations, where the considerations of policy and justice are sufficiently compelling judicial scrutiny and relief are available. In dealing with an organization in which membership is an economic necessity, the courts must be particularly alert to the need for protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity to earn a livelihood while not impairing the proper standards and objectives of the organization. The necessity of court action is apparent where the position of a voluntary association is so dominant in its field that membership in a practical sense is not voluntary but economically necessary.[43]

¶ 30 This Court discussed in detail the purposes and mission of the NCAA in regulating intercollegiate athletics, which mirror closely those of the OSSAA in Oklahoma for regulation of competition between secondary schools.[44] What was true of the NCAA in 1977, is true of the OSSAA today. Because

---

42. OSSAA Constitution, 2012–2013, Art. IV, § 3 provides:
   MEETINGS:
   All meetings shall be subject to the Open Meeting Law of the State of Oklahoma.

43. *Bd. of Regents of University of Oklahoma v. National Collegiate Athletic Ass'n*, see note 13, supra at ¶ 12 (footnotes omitted).

44. *Compare Bd. of Regents of University of Oklahoma v. National Collegiate Athletic Ass'n*, see note 13, supra at ¶ 4, providing:
   The NCAA is a voluntary association comprised of approximately 800 members. Its active members are four-year colleges and universities located throughout the United States of which approximately 137, including the University of Oklahoma, are Division I members in football. One of the purposes of the NCAA is to legislate, through bylaws or by resolution of a convention, upon any subject of general concern to the members in the administration of intercollegiate athletics. A fundamental policy is the application of legislation governing the conduct of intercollegiate athletic programs of member institutions to basic athletic issues, such as admissions, financial aid, eligibility and recruiting. The NCAA has among its purposes the initiation, stimulation, and improvement of intercollegiate athletic programs for student-athletes, and the promotion and development of educational leadership, athletic excellence, physical fitness, and sports participation as a recreational pursuit. It also seeks to encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship, and amateurism. In furtherance of these purposes, the NCAA has certain fundamental policies which recognize that the competitive athletic programs of the colleges which are members of the NCAA are designed to be a vital part of the educational system. It also seeks to maintain such intercollegiate athletics, including coaching activities, as an integral part of that educational program, and to maintain the athlete as an integral part of the student body. It seeks to maintain a clear line of demarcation between college athletics and professional sports, so that intercollegiate football will be played by amateur student-athletes who engage in such sports for education, physical, mental, and social benefits and to whom participation in such sports is an avocation rather than a business.
   *With* OSSAA Constitution, 2012–2013, r. 35, providing:
   **ARTICLE II–PURPOSES**
   Section 1. The Oklahoma Secondary School Activities Association through the employment of the instrumentalities hereinafter established shall:
   a. Provide effective coordination, leadership, supervision, and regulation for secondary school activities including the program of interscholastic activities and contests in which its member schools may participate.
   b. Perform such other related functions as may from time to time be approved and adopted by the Board of Directors and the membership.
   Section 2. More specifically, the objectives of the Association include:
   a. The promotion of important educational and cultural values, attitudes, appreciations, and skills appropriate to all interscholastic activities, including high standards of good sportsmanship and effective citizenship for both secondary school students and adults.
   b. The protection of individual students and member schools from exploitation by special interest or pressure groups.
   c. The evaluation and regulation of local, state, and national contests initiated by organizations, firms, institutions, and foundations

the role it plays in our State, goes above and beyond that of a traditional voluntary association, closer scrutiny when reviewing its actions is a necessity.

¶ 31 Member fees are paid by Oklahoma public schools in order to be part of the OSSAA.[45] Because the source of funding of public schools is from Oklahoma taxpayers, the State of Oklahoma has an interest in ensuring that tax dollars are used by the OSSAA in a manner that is not arbitrary and capricious, but one that is fair and impartial. Meaningful review of the OSSAA's actions is necessary to ensure this.

¶ 32 The district court, therefore, erred in showing near complete deference to the OSSAA regarding its internal procedures. The standard of review from *Morgan*, supra, relied upon by the district court in making its ruling cannot properly be applied to a nominally voluntary association that is not truly voluntary. While the OSSAA is not a state agency subject to the provisions of the APA, it is similar enough in character and in reach that courts should apply the standard of review provided by the APA in 75 O.S.2011 § 322 for agency decisions.[46]

## II.

### Under Any Standard of Review, the OSSAA's Determinations Were Arbitrary and Capricious.

¶ 33 Even under the review standard in *Morgan*, supra, however, supposedly voluntary associations are still prohibited from engaging in behavior that is unreasonable, arbitrary, or capricious in the enforcement of their rules.[47] Unlike in *Morgan* and *Brown*, the record in this cause, as discussed below, contains copious evidence that the OSSAA acted in a manner that was arbitrary and capricious. Even applying the *Morgan* standard, the district court erred by entering a decision against the evidence in failing to grant a permanent injunction prohibiting the OSSAA from enforcing its determinations as to Scott.

¶ 34 Scott argues on appeal that the district court erred in deferring to the OSSAA because the OSAA's decisions were arbitrary, capricious, and unreasonable. At issue is the OSSAA's determination that Scott participated in certain camps where fees and expenses were paid in violation of OSSAA rules and policies. Scott does not contest that Sequoyah paid fees and expenses for football players, including Scott, to attend individual camps.[48] Rather, Scott asserts the OSSAA's interpretation of its rules and its application of them were arbitrary and capricious. While this Court has yet to construe the meaning of arbitrary and capricious within the context of § 322, two divisions of the Court of Civil Appeals have defined it as acting in a manner that is wilful and unreasonable without consideration or in disregard of facts or without determining principle or

outside recognized educational agencies affecting secondary schools.
d. The effective regulation of interscholastic activities so that they are not permitted to interfere with the regular programs of education provided in Oklahoma secondary schools.
e. Encouragement of economy in the time of both students and teaching personnel devoted to organized activities.
f. The fostering among individual students and member schools of pride in academic achievement as a foundation for a contributive, well-balanced activity program.
g. The provision of leadership resulting in careful evaluation of the entire activity program in individual secondary schools.
h. The assurance that secondary school activities shall make their adequate contribution to the total education program of secondary education in Oklahoma.
Section 3. MISSION STATEMENT

The OSSAA will serve member schools by providing leadership in the development, supervision, and conduct of cocurricular activities, which enrich the educational experiences of high school students. It will provide for equitable participation opportunities and positive recognition to students as a whole, while working cooperatively with schools to enhance the achievement of desired educational goals.

45. OSSAA Constitution, 2012–2013, Art. III, § 3, r. 35.

46. Title 75 O.S.2011 § 322, see note 32, supra.

47. *Morgan v. Oklahoma Secondary School Activities Ass'n*, see note 17, supra at ¶ 18–19; *Brown ex rel. Brown v. Oklahoma Secondary School Ass'n*, 2005 OK 88, ¶ 10, 125 P.3d 1219.

48. Transcript of proceedings before the Hon. Darrell G. Shepherd, November 8, 2012, p. 4–13, r. 234.

unreasoning in disregard of facts and circumstances.[49] While agency decisions are due some deference, we find the words of the United States District Court for the District of Columbia in *Conservation Law Foundation v. Evans*, 209 F.Supp.2d 1, 8 (D.D.C. 2001), to be apt: "courts do not hear cases merely to rubber stamp agency actions. To play that role would be tantamount to abdicating the judiciary's responsibility."

¶ 35 Scott argues that OSSAA's retroactive application of portions of its policies is arbitrary and capricious. We agree. Retroactive application of policies that did not exist for the majority of the alleged violations is inherently arbitrary and capricious because it has no basis in reason and is in complete disregard of the facts and circumstances. The OSSAA determined that Sequoyah paying the fees for various individual camps in which Scott participated violated OSSAA Policy X(D), which provides in pertinent part:

> D. An individual student who is attending or who is enrolled and planning to attend a member school in grades 7–12:
>
> . . . .
>
> 2. may participate in individual camps and clinics in a particular activity, however:

. . . .

> (c) no fees or expenses for the camp or clinic may be paid by the school, or by school personnel, or by any booster club or organization associated with the school, or by any non-family member; any discount or waiver of fees or expenses must be based on financial need, and must be available to all participants based on the same standards;[50]

Scott insists that this policy provision came into effect after he attended most of the individual camps at issue. The OSSAA contends that the specific provisions of policy X.D.2. had been in effect since the start of Scott's alleged violations in 2009.[51] This is incorrect by the OSSAA's own admission. It is not disputed that the specific language on X.D.2. did not appear until the 2011–2012 policy. Application of this specific provision, then, to find Scott ineligible, was not appropriate prior to the effective date of this new language.[52] In response, the OSSAA asserted that camp policy in effect before July 2011, in the form of Policy X.B., plainly stated that a student's attendance at an individual camp would be paid by the student or his/her family without concession.[53]

49. *Isch v. Oklahoma Independent School Dist. No. I–89 of State*, 1998 OK CIV APP 90, ¶ 12, 963 P.2d 18; *State ex rel. Bd. of Trustees of Teachers' Retirement System v. Garrett*, 1993 OK CIV APP 29, ¶ 6, 848 P.2d 1182; *Patrick v. State ex rel. State Bd. of Educ.*, 1992 OK CIV APP 153, ¶ 14, 842 P.2d 767.

50. OSSSA 2012–2013 Policies, X.D., R. 47.

51. Appellee's Answer Brief, pp. 15–17.

52. Scott asserts that the new Policies became effective in August, 2011, whereas the OSSAA asserts it became effective July 1, 2011. Regardless, prior to July 1, 2011, at the earliest, this specific language appears not have been part of the OSSAA policies.

53. Appellee's Answer Brief, p. 18. This is an erroneous reading of the language in effect at the time. Prior to the language of X.D.2. becoming effective, at the earliest on July 1, 2011, the controlling language the OSSAA asserts barred Sequoyah from paying for Scott's attendance was found in X.B., which provided:

> B: School personnel or anticipated school personnel shall be permitted to conduct summer training camps/clinics provided they comply with the following regulations: Note: A student shall be ineligible in basketball and/or football until reinstated by the Board of Directors if he/she participates in a summer training camp/clinic involving coaching that does not comply with the OSSAA summer training camp/clinic regulations
>
> 1. Any session of any summer athletic training camp/clinic involving student athletes in grades 7–12, cannot be held before the school year concludes neither for the participants school district nor after the first full week in August.
>
> 2. During the school year participants cannot attend basketball or football camps/clinics and will be subject to penalty.
>
> 3. No football camps (individual or team) will be allowed after July 15 using OSSAA member school facilities or sponsored by OSSAA member school football coaches.
>
> 4. A student athlete shall be permitted to attend any number of summer athletic training camps/clinics for basketball and football, except they are limited to two team camps/clinics. Each student athlete is also limited to two summer-time tournaments.

¶ 36 A detailed examination of the record reveals that the OSSAA intended to, and did apply the then current version of Policy X, containing Section D.2., for all the alleged violations going back to 2009.[54] Even if the new Section D.2. took effect as early as the OSSAA asserts, on July 1, 2011, the OSSAA's attempt to apply it retroactively to the 11 camp attendances by Scott which occurred prior to that date, without any justification and in disregard of the underlying facts, was arbitrary and capricious.

## A. The Application of OSSAA Rule 9 Was Arbitrary and Capricious.

¶ 37 Both the final report drafted by the OSSAA staff and the Executive Director's November 3, 2012, letter making the initial determinations, concluded that Rule 9 of the OSSAA Rules prohibited payment by Se-

> Each team camp/clinic cannot exceed seven days in length. Summer time tournaments cannot exceed three days in length. Note: it is not required to sanction summer leagues or tournaments.
> 5. No session of any summer training camp/clinic will be approved for more than two consecutive weeks.
> 6. Only inter-camp practice sessions are permitted.
> 7. An individual camp/clinic fee (Oklahoma average or normal tuition) shall be charged and shall be paid by the student athlete or his/her parents without concession.
> 8. No awards having intrinsic value shall be offered or given to student athletes. T-shirts may be given as long as the T-shirt cost is included in the camp/clinic fee.
> 9. Upon request, the summer training camp/clinic director shall submit to the Activities Association office a roster of those student athletes in attendance at the respective camp/clinic
>
> OSSAA 2012–2011 Policies X.B., from Supplemental Brief in Support of Declaratory Judgment and Permanent Injunction, r. 178.
> Policy X.B. is a provision providing regulations that coaches must obey if they wish to conduct summer training camps/clinics themselves. While the provision does note that students will be ineligible if they participate in camps or clinics that do not abide by these regulations, that clause, taken with the first sentence and the 9 restrictions, seems to indicate that the students will be held ineligible if they participate in camps/clinics conducted by **OSSAA member school personnel** that violate the 9 provisions.

54. Email from Ed Sheakley to Marcus Crittendon, October 19, 2012, r. 146. Even more inter-

quoyah of fees for its students to attend individual camps.[55] Rule 9 is clearly and unambiguously directed towards recruitment of student-athletes, and Section 1 delineates this purpose. It provides:

> Section 1. Statement of purpose.
>
> OSSAA recognizes that permitting member schools to recruit students as athletes would place undue emphasis on secondary school athletic activities, and might cause competitive imbalances among member schools, misdirection of scarce educational resources, and threats to the continued amateur standing of students. Accordingly, no member school is permitted to recruit a student to select or transfer to that school, or to encourage or allow others to do so on its behalf, based on that student's skill, reputation, or experience in athlet-

esting, in addition to adding the language of Section D.2., it appears the OSSAA also inserted a Camp Questions and Answers section that was previously not part of the policy, detailing specific examples of who would be allowed to pay for individual camps. Presumably, this clarification set of questions and answers was added precisely because members did not understand or were unaware of the OSSAA's convoluted policies and their year-to-year changes.

55. Ed Sheakley's November 3, 2012 letter to Sequoyah's athletic Director, r. 159, states:

> OSSAA's camp policy is not the only rule or policy implicated in view of the information provided. OSSAA Rule 9 provides in relevant part that: "Offering economic incentives or rewards of any type to a student-athlete, which are not available to all prospective students on an equal basis, regardless of participation in athletics ... constitutes recruiting in violation of this rule." OSSAA Rule 9 also provides that a violation may occur when offering or providing special or additional coaching or instruction that is not offered or made available to other student athletes at the school on an equal basis...." Violation of Rule 9 also can be cause for sanction of the School.

The OSSAA Report on Violations at Sequoyah High School Associated with Payment of Expenses for Individual Athletic Camps–November 6, 2012, r. 116 provides:

> The records provided by the School further indicated that the school's prior athletic director and prior superintendents signed off on forms approving the expenditure of school funds to enable these students to attend these individual camps, in violation of OSSAA's camp policy and Rule 9.

ics.[56]

The plain language of Section 1 indicates that the purpose of Rule 9 is to prohibit schools from offering special treatment to prospective student athletes. This is reinforced by Section 2, which also concerns recruitment.[57]

¶ 38 When the Executive Director made his initial determination of forfeiture based on ineligibility by letter on November 3, 2012, his only explanation regarding the application of Rule 9 to Sequoyah's payment for Scott and others to attend individual camps was to state that "[t]he school's regular payment of expenses for certain student-athletes, particularly its most prominent and skilled football players, obviously could be viewed as an economic incentive for skilled student athletes to attend and remain at the school ..." The same statement is repeated in the OSSAA's report on November 6, 2012.[58] The above hypothetical is the only real explanation given by the OSSAA as to how Sequoyah might have violated Rule 9. At no point did the OSSAA allege or attempt to prove that the payment of individual camp fees by Sequoyah for its football players, including Scott, constituted:

[o]ffering economic incentives or rewards of any type to a student-athlete, which are not available to all prospective students on an equal basis, regardless of participation in athletics, or offering such economic in-

centives or rewards to the student-athlete's family members, friends, or associates, for the purpose of encouraging that student-athlete to select, transfer to, or remain at a member school.[59]

Nor did the OSSAA allege or attempt to prove in any way that Sequoyah was

offering or providing special or additional coaching or instruction that is not offered or made available to other student-athletes at the school on an equal basis, or providing special attention or consideration to a student-athlete who is considering transferring, for the purpose of influencing that student-athlete to remain at the school.[60]

Nor did the OSSAA allege or attempt to prove that Sequoyah was paying for individual camps for the purposes of recruiting anyone to come to Sequoyah or to remain there. In fact, the article that apparently sparked the OSSAA's investigation indicates that while recruitment was indeed the primary purpose of the whole endeavor, the recruitment discussed was the recruitment by college programs of current Sequoyah students, which is no way regulated or touched upon by Rule 9. Rule 9, Section 9 defines when a violation of Rule 9 has occurred, and reinforces the notion that application of Rule 9 in this instance was both arbitrary and capri-

56. OSSAA Rules, 2012–2013, Rule 9, § 1, r. 42. The record does not contain earlier versions of the OSSAA's rules that would have been in effect during earlier alleged violations, however, unlike with the OSSAA policies, Scott does not allege, and nothing in the record indicates, that Rule 9 has changed in any way over the period from 2009 to the conclusion of the OSSAA's investigation. Accordingly, citations are to the 2012–2013 version of Rule 9 included in the record.

57. OSSAA Rules, 2012–2013, Rule 9, § 2, r. 43, provides:
Section 2. Recruitment defined.
Recruiting includes initiating or maintaining contact with a student-athlete, or the student-athlete's family members, friends, or associates, in circumstances that could influence that student-athlete to select or transfer to a member school for the purpose of representing that member school in athletic competition. Offering economic incentives or rewards of any type to a student-athlete, which are not available to all prospective students on an equal basis, regardless of participation in ath-

letics, or offering such economic incentives or rewards to the student-athlete's family members, friends, or associates, for the purpose of encouraging that student-athlete to select, transfer to, or remain at a member school, also constitutes recruiting in violation of this Rule. Recruiting may also include offering or providing special or additional coaching or instruction that is not offered or made available to other student-athletes at the school on an equal basis, or providing special attention or consideration to a student-athlete who is considering transferring, for the purpose of influencing that student-athlete to remain at the school.

58. The OSSAA Report on Violations at Sequoyah High School Associated with Payment of Expenses for Individual Athletic Camps–November 6, 2012, r. 116.

59. OSSAA Rules, 2012–2013, Rule 9, § 2, r. 43.

60. OSSAA Rules, 2012–2013, Rule 9, § 2, r. 43.

cious, because it is plainly not applicable here.[61]

### B. The OSSAA's Investigation Procedure and Penalties Were Arbitrary and Capricious.

¶ 39 After a lengthy period of information gathering and one on one interactions with students and parents, a report regarding the OSSAA's investigation, findings, determinations, and proposed sanctions was provided to the School, the attorneys, and the OSSAA's Board of Directors.[62] This report was given to those affected on November 6, 2012, one day before the next scheduled meeting of the OSSAA Board of Directors, November 7, 2012, during which those affected would be permitted to appeal. Scott had one day to prepare for and answer all the allegations contained in a twenty-page report. It is difficult to see how it is reasonable under the circumstances to sanction an individual without sufficient notice of all the allegations and proposed sanctions.

¶ 40 Pursuant to the OSSAA Constitution, the Executive Director is given almost unlimited leeway to impose restrictions and penalties prior to the completion of any investigation.[63] We previously criticized the excessive leeway granted to the Executive Director by the OSSAA Board in *Wright City Public Schools v. Oklahoma Secondary School Activities Ass'n*, 2013 OK 35, ¶¶ 29–33, 303 P.3d 884. It is apparent that the OSSAA has continued to allow the Executive Director unlimited authority.

¶ 41 On November 7, 2012, the OSSAA Board adopted all of the sanctions recommended in the formal report drawn up by OSSAA staff, rubberstamping the Executive Director's actions, with the exception of the recommendation that each student be required to reimburse the School for the camp expenses paid, and to sit out of one future game or contest in the student's next activity for every camp attended at School expense.[64] For several of the recommended sanctions in the report, the OSSAA staff referenced authorizing authority under the OSSAA Constitution, Rules, and Policies.[65] However, some

---

61. Rule 9, § 9, determines when a violation has occurred, and is not applicable in this situation. It provides:

Section 9. Violation of Rule

a. A school will be in violation of this Rule and subject to sanction if the school encourages or permits school employees or representatives to recruit student-athletes to enroll at or transfer to that school. Permitting a student-athlete who has been recruited to enroll at or transfer to the school to represent that school in an event shall also be considered a violation of this Rule which would subject the school to potential sanction. A failure to obtain, maintain, submit, or make available the written policies, certifications and summaries required under this Rule also violates this Rule and will subject the school to potential sanction.

b. If a school receives information indicating that a student-athlete is being recruited, or was or may have been recruited, to enroll at or transfer to that school, then the school shall provide a written report to the Executive Director as soon as possible, identifying the student-athlete and those persons who are, were, or may have been involved in recruiting that student-athlete.

c. The fact that a school reported a known or suspected violation of the recruiting rule involving a student-athlete at that school may be considered by the Association, if a violation is determined to have occurred, in evaluating what sanction may be imposed on the school.

d. A student-athlete may be subject to sanction, including the loss of eligibility, if the student enrolls at or transfers to a school that has sought to recruit, or allowed its employees or representatives to recruit, that student in violation of this Rule, or if the student or the student's family participates in recruiting other student-athletes to enroll in or transfer to the school in which that student is presently enrolled or planning to enroll.

OSSAA Rules, 2012–2013, Rule 9, § 2, r. 45.

62. Appellee's Answer Brief, p. 5

63. OSSAA Constitution, 2012–2013, § 6(d), r. 39.

64. Defendants Brief in Opposition to Intervenor's Petition for Declaratory Judgment and Permanent Injunction, p. 7, r. 93. OSSAA's Board opted not to require that students sit out of any contests in upcoming sports.

65. The list of penalties recommended by OSSAA staff in their report, and imposed by the Board is worth listing in full here (excepting provision 8, as the OSSAA Board declined to impose it):

*Recommendations*

In view of the determinations thus far, the OSSAA staff recommends the following:

1) that the School be prohibited from conducting spring football practice during 2013, as permitted under OSSAA Rule 16(1)(e); that students from the School be prohibited from participating in any team football camps or

of the penalties imposed by the OSSAA upon Sequoyah and the students, including Scott, come with no explanation or authorization from the OSSAA's own Constitution, Rules, or Policies. The two most disturbing examples are penalties 5) and 7), which state:

> 5) that the School reimburse OSSAA for the attorney fees and other costs associated with the investigation of the above-referenced violations, up to a total of $25,000.00;
>
> 7) that the school require all current students for whom individual camp expenses were paid in violation of OSSAA policies and rules to reimburse the School for all such expenses; if the students and families can demonstrate that they are financially unable to reimburse the School in full, a payment plan or a waiver of the requirements can be considered, but must be discussed with the OSSAA; [66]

No authorizing provision from the OSSAA's Constitution, Rules, or Policies was provided

for these penalties, and the parts of the OSSAA Constitution, Rules, and Policies included in the record do not anywhere authorize such penalties. Because this Court holds the OSSAA's decision regarding payment of fees by Sequoyah for most of the individual camps in question to be arbitrary and capricious, it naturally follows that imposition of steep monetary penalties, without an apparent basis in the OSSAA's Constitution, Rules, or Policies, is likewise arbitrary and capricious. It completely disregards the underlying facts and circumstances.

¶ 42 The imposition of recommendation five disturbs this Court. In our recent decision in *Wright City Public Schools v. Oklahoma Secondary School Activities Ass'n,* 2013 OK 35, 303 P.3d 884, at least three members of this Court expressed concern that the Executive Director of the OSSAA chastised Wright City Public Schools for seeking judicial relief.[67]

---

clinics, as permitted by OSSAA Policy X, section D(3)m during the summer of 2013; and that students from the School further not be permitted from participating together on a seven-on-seven league team in the summer of 2013;
2) that the School be prohibited from playing any interschool football scrimmages before the opening of the 2013 regular football season, as permitted under OSSAA Rule 16(1)(g);
3) that the School be placed on warning status for a two-year period, meaning that the discovery of any serious rule violations occurring during that period could result in the school being placed on probation, or being suspended from membership;
4) that the School be required to complete an operational audit of all of the School's sport's programs to determine: (a) whether any other current student is ineligible under any applicable rules or policies; (b) whether coaches are knowledgeable about and complying with all applicable rules and policies; and (c) what institutional and/or procedural changes should be implemented to insure that violations of OSSAA rules and policies do not occur in the future; the school shall provide OSSAA with a written report on such operational audit on or before January 14, 2013; if in the course of the operational audit and review the school finds that any students are or likely to be ineligible, then the students will be held out of participation in School athletics unless and until reinstated after disclosure and discussion with the OSSAA;
5) that the School reimburse OSSAA for the attorney fees and other costs associated with

the investigation of the above-referenced violations, up to a total of $25,000.00
6) that the head football coach Scott, although already on administrative leave from the School, be suspended formally from any coaching duties at the School or any other OSSAA-member school; that after one year he may apply to OSSAA's Board of Directors for reinstatement from suspension; that Mr. Grigg, although earlier replaced as athletic director at the school, should also be deemed to be suspended from any athletic director duties, and not be returned to the position of athletic director at the School unless and until he has been reinstated from suspension by OSSAA's board of directors;
7) that the school require all current students for whom individual camp expenses were paid in violation of OSSAA policies and rules to reimburse the School for all such expenses; if the students and families can demonstrate that they are financially unable to reimburse the School in full, a payment plan or a waiver of the requirements can be considered, but must be discussed with the OSSAA;
The OSSAA Report on Violations at Sequoyah High School Associated with Payment of Expenses for Individual Athletic Camps–November 6, 2012, r. 128.

66. The OSSAA Report on Violations at Sequoyah High School Associated with Payment of Expenses for Individual Athletic Camps–November 6, 2012, r. 128.

67. Concurring specially, Justice Combs stated:
The Executive Director after having been challenged for his initial determination of punish-

¶ 43 In the course of this matter, the formal report drawn up by OSSAA staff appears to levy criticism against those seeking relief from the courts. In a section of the report labeled Discussion of Delayed Response and Rationales from the Coach and School, the report asserts:

> [w]ith the School having belatedly determined particular students were ineligible, but nevertheless insisting that the students be permitted to continue playing, some of the students and parents filed legal actions against the OSSAA, thereby substantially increasing OSSAA's costs associated with this investigation. These costs obviously place additional constraints on OSSAA's limited budget and resources.[68]

This finding appears to be an attempt to justify enhanced sanctions against Sequoyah, Scott, and others because some of those subject to the OSSAA's investigation and determinations chose to seek protection from the courts from what they perceived as unjust action by the OSSAA. This statement also appears to be the justification for the imposition of recommendation five, whereby the OSSAA ordered Sequoyah to reimburse it for legal expenses it incurred as a result of Scott and other students and their parents challenging the OSSAA's actions in the district court. This reimbursement was ordered without any apparent justification from the OSSAA's Constitution, Rules, or Policies.

## CONCLUSION

¶ 44 An examination of the record reveals that Scott did attend some individual camps after Policy Section D.2. was added and took effect. Scott makes several creative arguments regarding the interpretation of this section, and even if they are not wholly convincing, they do cast doubt on the supposedly absolute and unequivocal nature of this Section as presented by the OSSAA. Regardless, these camps represent but a small portion of the laundry list of violations of which Scott is accused. The overall character of the OSSAA's investigation and application of its own rules is of such an arbitrary and capricious character that as to Scott it must be thrown out in its entirety.

¶ 45 This Court has permitted the OSSAA, in the guise of a voluntary association, to govern the affairs of secondary school athletics in Oklahoma with near impunity. No more. An organization interwoven so tightly with the public school system and the statutes of Oklahoma, in which membership is functionally required to participate in nearly all extra-curricular activities, is not truly voluntary. We will, when necessary, examine its actions with the same careful depth we use in examining the decisions of state agencies. This examination should not be withheld from the prevailing party—nor should similarly situated litigants who have preserved the issue on appeal be bypassed, and left unaffected and unprotected in the appellate pipeline.[69] To that end, our decision shall apply to this case, to cases now pending before judicial or administrative tribunals or in the appellate litigation process, as well as

---

ment, chastised Wright City for "seeking judicial relief and for the disruptive delay of the tournament". The Board cannot comply with due process if the decision to punish is so firmly established to vitiate the fairness and impartiality of the appeal process. Punishing a "voluntary" member cannot be prejudged and an open opportunity to appeal must be afforded.
*Wright City Public Schools v. Oklahoma Secondary School Activities Ass'n*, 2013 OK 35, ¶ 2, 303 P.3d 884 (Combs, J., concurring specially).
In her dissent, Justice Gurich, joined by Vice Chief Justice Reif, stated:
> While I agree that in any future challenges to a decision made by the Executive Director, an appeal should be taken to the OSSAA Board of Directors prior to seeking relief in district court, I dissent to the application of this procedure to this case. Without a doubt, the actions

of the Executive Director were arbitrary, and his criticism of Wright City for seeking judicial relief is so compelling that a hearing before the Board cannot be fair or impartial under these circumstances.
*Wright City Public Schools v. Oklahoma Secondary School Activities Ass'n*, supra at ¶ 1 (Gurich, J., joined by Reif, V.C.J., dissenting).

68. The OSSAA Report on Violations at Sequoyah High School Associated with Payment of Expenses for Individual Athletic Camps–November 6, 2012, r. 127.

69. *Strelecki v. Oklahoma Tax Com'n*, 1993 OK 122, 872 P.2d 910 (establishing general rule of retroactive application); *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).

to all judicial review of OSSAA actions after this opinion is promulgated.[70]

¶ 46 However, under any standard of review, the OSSAA has never been permitted to act in an arbitrary and capricious manner in interpreting and enforcing its own rules. We are left in this instance with little doubt that it has done so. While it is true that the events for which Scott sought the permanent injunction have passed, and that while this type of conduct has up until now been capable of repetition, we trust this will be the last time. To the extent any monetary penalties were leveled, such as the demand to repay the costs for camps allegedly attended in violation of the OSSAA's policies or for reimbursement of attorney fees, those penalties are reversed.

¶ 47 Competition in sports is more than a mere passing enjoyment for students. Particularly in rural areas, athletic teams are the glue which holds the community together. The college and post-college careers of student athletes often have their genesis at the secondary school level, and for some provide the only path to higher education. The OSSAA wields too much control over their future to be allowed to act in an arbitrary and capricious manner in applying its rules. It must be reasonable, it must be conscientious, and it must be fair. From now on, we trust, it will be.

**THE JUDGMENT OF THE TRIAL COURT IS REVERSED.**

CONCUR: COLBERT, C.J., REIF,. V.C.J., KAUGER, WATT, EDMONDSON, COMBS (by separate writing) and GURICH, JJ.

DISSENT: WINCHESTER, J. (by separate writing) and TAYLOR, J.

TAYLOR, J., with whom WINCHESTER, J., joins, dissenting;

Changes, if any, at the OSSAA should be initiated by the legislature and/or the OSSAA membership. This case is certainly not worthy of any relief due to the fact that this student, coach and school clearly and flagrantly violated the rules. The trial court correctly decided all the issues.

COMBS J., concurring:

¶ 1 I concur in the majority opinion but write separately to express my opinion on the issue of the "voluntary nature" of the OSSAA. The OSSAA asserts its status as a voluntary association, a position we have continually acknowledged in our previous opinions; most recently, *Wright City Public Schools v. Oklahoma Secondary School Activities Ass'n*, 2013 OK 35, 303 P.3d 884, *Brown v. Oklahoma Secondary School Activities Ass'n*, 2005 OK 88, 125 P.3d 1219, and *Morgan v. Oklahoma Secondary School Activities Ass'n*, 2009 OK 21, 207 P.3d 362. The nature of this "voluntary" status is discussed as set forth in the majority writing with which I concur. However to further support the need for "state oversight", it is necessary to consider how the membership of the voluntary association derives its funding.

¶ 2 At the time of the fact pattern relevant to the decision in this case there were 491 members of the Association. According to the Constitution of the Association, membership in the Association shall be open to public schools under the supervision and direction of district boards of education. Any secondary school desiring to become a member is required to file with the Executive Director a resolution adopted by the board of education or by the governing authority for the school applying for membership. The resolution authorizes membership and directs the administrative head of the school to comply with the requirements for member schools. Upon submitting the resolution and all entry fees, a public school shall be admitted to membership. As noted in *Christian Heritage Academy v. Oklahoma Secondary School Activities Ass'n*, 483 F.3d 1025 (10th Cir.2007), "OSSAA members are 98 percent public schools...." Although the record and public information for the association does not currently identify how many of the members are public school districts as compared to private schools, it would appear a considerable majority of the members are public institutions, i.e., independent school districts located throughout the State of Oklahoma.

70. *Globe Life & Accident Ins. Co. v. Oklahoma Tax Comm'n*, 1996 OK 39, ¶ 20, 913 P.2d 1322.

**910**

By the Association's constitution, to be eligible to serve as a member of the Board of Directors, one must be a district superintendent, assistant superintendent, or their equivalent, high school principal or assistant high school principal for a member school offering grades nine to twelve. *See Article IV, Section 1 of the OSSAA Constitution.* More succinctly, of the current membership of the Board of Directors, all are employees of public school districts.

¶ 3 A public school member of the OSSAA would have a funding source which by definition would primarily be public funds. *See* Okla. Const. art. 10, § 9 and art. 13, §§ 1 and 1a. We therefore have a voluntary association acting with state acquiescance and authority, funded primarily by state funds, but subject to judicial oversight only when there is a finding of "fraudulent, collusive, unreasonable, arbitrary or capricious behavior." *See Morgan v. Oklahoma Secondary School Activities Ass'n,* 2009 OK 21, 207 P.3d 362. What other "voluntary association", funded primarily by public funds, maintains such protection? Closer scrutiny of the actions of the Oklahoma Secondary School Activities Association is warranted.

WINCHESTER, J., with whom, TAYLOR, J., JOINS, Dissenting.

¶ 1 I respectfully dissent. The facts of this case are paramount in reaching a decision. In the summer of 2012, the Oklahoma Secondary Schools Activity Association began investigating rule violations related to Sequoyah High School paying for selected players to attend individual football camps. According to the Association's Brief in Opposition to Plaintiff's Application for Injunctive Relief, their first inquiry to Sequoyah occurred in July 2012. The school lagged in responding to inquiries, the first response being an undated letter from Coach Scott that arrived September 10, 2012. Requests for additional information went back and forth throughout the month of September with both the Association and the Sequoyah Athletic Director requesting more information from Coach Scott. Finally, on October 16, 2012, Sequoyah filed a report showing eight varsity football players had attended camps paid for by Sequoyah.

¶ 2 The Association's rules and policies on this subject are clear—schools are not allowed to offer economic incentives to student athletes that are not available to other students or offer additional coaching or instruction not available to other student athletes at the school. Fees for these individual camps were both economic incentives and additional coaching. While it may not have been a recruitment tool in this particular case, it is still a violation of the rules, giving the Sequoyah team an unfair advantage over rivals who had followed the rules. In addition, this particular expenditure of school funds favored the Sequoyah football team, likely to the detriment of other Sequoyah athletes who were not given the opportunity to attend individual camps in their respective sports.

¶ 3 The plaintiff in this case, Quarterback Brayden Scott, the son of Sequoyah High School's head football coach, does not contest that he broke the rules. His other teammates and Sequoyah High School also admitted breaking the rules and accepted the Association's determination. These are the facts of the case. The trial court rightly decided Scott could not prevail on the basis of the facts. The actions of Coach Scott, and his son, not only jeopardized their reputations and eligibility, but also those of the other players, the team, and Sequoyah High School.

¶ 4 The Association is a self-governing body overseeing not only football, but all high school sports, music, speech and debate competition. Each of the fourteen members of the Association's board of directors is either a superintendent or principal of their respective school district. The board currently consists of administrators from Claremore, Adair, Braggs, Enid, Watonga, Shattuck, Durant, Kingston, Kiowa, Yukon, Rush Springs, Snyder, Mid–Del and Westmoore: a group reflecting diversity in both geographic area and school district population. The primary duty of these individuals is the education of students in their own school district, thus the practical reality of a board that only meets monthly, even during football season when eligibility questions may arise.

¶ 5 Student athletes and school districts who disagree with Association rulings are clearly able to avail themselves of court. It would appear the speed with which these matters are addressed depends largely on those being investigated. In this particular case, it appears responses were intentionally slow in hopes of making it through as much of the season as possible.